**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Calvin JONES, Defendant-Appellant.**

**No. 84–5016.**

United States Court of Appeals,
Eleventh Circuit.

July 15, 1985.

---

David Walbert, Walbert & Hermann, Atlanta, Ga., for C. Jones.

William Norris, Linda Collins-Hertz, Nancy L. Worthington, Lee Stapleton, Asst. U.S. Attys., David O. Leiwant, Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and HENDERSON, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge:

This case is before the court on appellant Calvin Jones' appeal from a judgment and sentence in the United States District Court for the Southern District of Florida. Jones and two other persons had been indicted on two counts:

1. Combining, conspiring and confederating to commit an offense against the United States under 21 U.S.C. § 952(a) and 960(a)(1), the purpose and object of the conspiracy being to use helicopters to import into the United States a quantity of marijuana in violation of 21 U.S.C. § 963.

2. Combining, conspiring, and confederating to commit an offense against the United States under 21 U.S.C. § 841(a)(1) to use helicopters with intent to distribute a quantity of marijuana in violation of 21 U.S.C. § 846.

Both sections 846 and 963 are sections making it criminal to conspire to commit the offenses denounced in the other sections cited by the grand jury, and these are the illegal importation and distribution of a contraband substance, marijuana.

Besides Jones, the persons indicted were Robert M. Brown, Kevin O'Brien, and persons unknown to the grand jury. Before trial by jury, it was stipulated there were no unindicted co-conspirators. Brown was convicted, but abandoned his appeal. O'Brien was acquitted. Jones is therefore the only appellant before us.

The legal question to be decided is whether an "agreement" can be found sufficient to constitute a criminal conspiracy, when alleged co-conspirators present mere proposals to an undercover narcotics agent posing as a drug importer and dealer, requiring acceptance by the agent before activation, when the required acceptance was never forthcoming and the proposals were never put in effect. In the specific fact setting of this case, at least, our conclusion is that there was no "agreement" and therefore no criminal conspiracy. In view of this, the conviction was based on insufficient evidence and cannot be sustained.

---

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

## Facts

The testimony was all on behalf of the prosecution and was all by government agents, but unsupported by tapes or documents. The agents testified in a forthright manner and we assume the jury could properly have believed everything they said. William J. Segarra, of the United States Drug Enforcement Agency (DEA) and first prosecution witness, departed from his normal duty station in east Florida to conduct an undercover investigation in west Florida, posing as Willie Santos, a marijuana smuggler, but we will identify him hereinafter as Segarra, not as Santos. Through an informant intermediary, he met a west Florida smuggler, Brown, whose special metier was providing other smugglers with what in a legitimate business might be called stevedoring or lightering, i.e., to bring the contraband ashore from hovering vessels in small boats or aircraft and deliver it by truck to "stash" houses where it might be safe pending distribution by the customer of the services. Segarra had discussed with Brown making use of these services in connection with his vessel, a shrimper, which was carrying 40,000 pounds of marijuana from South America. On April 1, 1982, the two men met again in a cocktail lounge in Naples, Florida. Segarra told Brown he would not be using Brown's services after all, because the shrimper had been seized by the "sharks," i.e., United States Coast Guard, in the Yucatan passage.

This passage or channel is a strait under 100 miles wide, about 1,000 miles north of the source of supply of the marijuana in Colombia, and 500 miles, approximately, southwest of west Florida. It passes between the west end of Cuba and the east or northeast end of Yucatan. Yucatan is a province of Mexico and is a broad flat peninsula extending northeast from the mainland mass of Central America. The passage is somewhat of a hole in the wall which a vessel bound from Colombia to west Florida must transit, and the United States Coast Guard was in the period covered by the indictment, April 1—July 28, 1982, blocking the passage so a contraband cargo could not be carried through, or so the figures in this case believed. The jury had the benefit of a map so it could understand the geography, which is very relevant.

The seized vessel, of course, was fictitious, as Segarra was not a smuggler and owned no interest in any vessel or cargo.

Brown commiserated and gave accounts of his own experiences and loss of business caused by the Coast Guard. He then said that he and others had "discussed and thoroughly figured out a way" to avoid the Coast Guard which was by having a Yucatan-based helicopter meet the vessel coming up from the south, lift up the marijuana beneath the helicopter in a sling, carry it over the passage or the adjacent land, and load it into a large vessel (presumably another large vessel) waiting to the northward of the passage, and bring the vessel to the west coast of Florida. Brown said the person or persons, unnamed at this conversation, had two helicopters good for a load of about 1,200 pounds each, and one person, being knowledgeable with explosives, could provide means to destroy vessels and cargoes when necessary to destroy evidence.

At another meeting on April 15, Segarra tried unsuccessfully to interest Brown in a project to smuggle methaqualone powder from the Grand Bahamas, to the west coast, which sounds like a pretty circuitous voyage. Brown reverted to his helicopter project saying his "sources" were considering establishing a lumber business in Yucatan which "would be a front" for smuggling marijuana into the United States. Segarra said his "sources" (using the same word but by the context different parties) were hesitating about another 40,000-pound cargo but "we were so hot in that area that we really don't know if we want to do it at this time;" "that area" apparently meaning the Yucatan passage. Both Segarra and Brown, in speaking of themselves and "sources," meant evidently to leave an ambiguity as to how much they were interest-

ed as principals and how much as agents for undisclosed principals.

The 28th of April, Segarra, accompanied by agent Barbara Barclay, who posed as his wife, met with Brown again in Naples. Brown rejected the methaqualone project again by quoting an impossibly high price, but reverted to the project to use helicopters in Yucatan of his own initiative. He had worked out the project which he said they now had "well planned." He wanted Segarra and Barclay to meet him the next day for lunch.

They did, and Brown said he would be joined by the "gentleman" he had referred to. He would leave and return to his job (boat builders across the street from the restaurant). His interest was the "off loading and everything else." The other would "do the helicopter with the boats and everything else." There is nothing in the record to show that "everything else" meant more than everything else connected with these tasks.

Jones now came on the scene and Brown introduced him as Cal Jones. Brown left, but his wife remained at the table with Barclay. Jones said at once, "[w]e discussed this thoroughly and we really believe we can do it. Do you wish to come in on it? Like to have you." "We can establish a lumber business on the Yucatan Peninsula in the Mexico Area." "Myself and Paul Gomez, we have contacts there in Mexico so we know how we will set up the business and we will set up the helicopters we will bring. Paul Gomez has the sources in South America, he will go over there, make the contacts, arrange that the boats are loaded up, bring it toward the West Coast." Then he described the intended use of the helicopters much as Brown already had. He said, however, though he already owned two, he would get two others of 5,000-pound capacity, which would cost not over $140,000 each. He further said " * * * initially, the start of our business was going to be expensive * * * we will invest so much money in the beginning * * * but considering all we are going to make the helicopters are expendable." Se-

garra further explained to the jury that the price of marijuana in South America was $9 or $10 a pound, whereas selling it after arrival in the United States would fetch $230 to $280 a pound.

Note the care with which the witness used pronouns. What Gomez will do "he" will do because Gomez is not a co-conspirator. What the member of the conspiracy will do "we" will do; however, Jones said "I" will get the helicopters. That was to be his part of the joint enterprise in the sense that he would be in charge of it. Presumably all the conspirators would share in providing the shrimpers, another item in the necessary capital, but costs of them are not discussed because Jones and Brown must have believed Segarra, in his pose as Santos, already had at least one shrimper ready to use. Segarra clearly was to provide not just money, but also the boats, in the same sense that Jones provided the helicopters. The government's argument that Segarra was to provide only money is therefore incorrect as Segarra's testimony cannot be so construed. While Gomez could get the marijuana, this was just a backup plan as Segarra had already said he had marijuana, or access to it, in the 40,000-pound quantity required, and was awaiting things getting less hot in the Yucatan passage before bringing it in. Barclay was quite clear, when she came to testify, that Segarra was to provide the marijuana (Tr. 257).

Jones now brought in his pilot, O'Brien, and one of his helicopters. Though it was smaller than the Huey or Vietnam war-type helicopter he proposed to use, O'Brien took Segarra and Barclay in it on a demonstration flight. He revealed that he had been briefed on the intended use of the large type and in his judgment, as an experienced helicopter pilot, the proposed use would present no technical difficulties. In Jones' introduction of Segarra to O'Brien he said "[t]his is the man I was telling you about, Kevin * * *," indicating he had not discussed with O'Brien any other possible deep-pockets co-venturer.

**1000**

After they all "exited" the helicopter and rejoined Jones at his table, Segarra said he found the idea "interesting," with "very good possibilities."

Jones said "[l]et's try a dry run * * * and I will demonstrate to you over there * * *. I need a commitment from you. Do you or don't you want to do it."

Segarra said, "I like it and I really think it can be done. I really do * * *. But let me think about it * * *. I just do not want to jump into anything. I have lost loads before and I do not want to lose it." Note that Segarra had lost loads before and Segarra did not want to lose one this time, indicating it would be his load as before. Jones asked for "up front" money before they were to go on the "dry run," which would have been a dress rehearsal without use of actual contraband, plus a study as to the practicability of the proposed cover business in Yucatan. Jones quoted $8 to $10,000 which clearly was but a small part of the capital they would need when they really decided to take the plunge. He didn't want to take Segarra to Yucatan on a mere sightseeing trip with no involvement.

Segarra presented the proposal to his superior and "it was decided they would not do it." No acquiescence was communicated to Jones, and nothing to effectuate the alleged conspiracy was ever done. The jury was told the first step would have been to go to Mexico, but not why this step was objectionable. The reasons were explained to the court in the absence of the jury and were that the Mexican Government would have to be informed of the presence of a DEA agent in Mexico and there might be a leak; that the ongoing surveillance of Brown and Jones by numerous other agents would not be possible in Mexico, and that the undercover agent would be personally endangered.

Customs Patrol Officer Ryan testified after Segarra, and it was established through him only that Jones owned two helicopters and that the one used in the demonstration ride was registered in Venezuela.

Barbara Barclay, a DEA agent, next testified. She was a "secondary agent" to Segarra and was with him at his meetings with Brown and Jones on the 28th and 29th of April, including the demonstration helicopter ride. While in the restaurant she had to listen to Mrs. Brown and while in the helicopter she was in a rear seat and without earphones, and the cabin was noisy, so she could not hear all that passed between Segarra and O'Brien, who did have earphones. Subject to these caveats, she corroborated Segarra's testimony. As stated above, she was positive that Segarra was to provide the marijuana. He posed as a "large smuggler with a lot of contacts." As to what Jones would do, "he told us he had the helicopters and the pilots to fly them and he would take care of the land for the phony lumber company that was to be set up." She also testified that Brown's role was not "to get involved in the smuggling part," meaning apparently the part preceding arrival of the vessel at or near the West Coast of Florida, as he was to provide small craft to "unload a mother ship," and trucks for hauling. All these might be smuggling in ordinary parlance if the cargo were not duly entered at the customs house. Still, the intent of both Brown and Jones to define limited roles for themselves and leave the rest to Segarra, was clear. This concluded the prosecution testimony and none was offered by defendants.

Smuggling a cargo of marijuana from South America to west Florida according to the plan referred to in both counts of the indictment, would include the following steps:

1. Send a shrimper to South America.

2. Purchase a cargo of marijuana and have it placed on board.

3. Proceed north in the shrimper about 1,000 miles to a point near but south of Yucatan and make contact with helicopters.

4. Provide Yucatan-based helicopters to pick up the cargo in slings and deliver it on board a shrimper north of Yucatan.

5. Proceed in the shrimper 500 miles more or less to or near to west Florida.

6. Unlade the shrimper and truck the cargo to a warehouse or other "stash" location.

Of these steps, Jones and Brown limited their proposals to steps 4 (Jones) and 6 (Brown), respectively. Possibly Gomez might have been called on to help in steps 2 and 6, as well as making contacts helpful to 4, but the proposals nowhere indicated he had agreed to do any of those things, and he was not, by the prosecution theory, a conspirator. Apparently Gomez was well known in south Florida and references to him were understood as references would have been by a Chicagoan to Al Capone in the twenties. Initially, tasks were all left up to Segarra if not otherwise specified.

It seems apparent as a factual matter that what we have to deal with are proposals that never ripened into an agreement except agreement between Brown and Jones to submit them to Segarra. They were specially tailored to fit Segarra's capabilities and needs as he had stated them to Brown. There is nothing to show that Brown and Jones ever agreed to do anything whatever in the event, which occurred, that Segarra rejected their proposals. It seems apparent that if another potential deep-pockets partner had come along, it would have been necessary to concoct other proposals, and those put before Segarra could not have been used. The government's argument made before us, that under the proposals, all Segarra had to do was pay money, is completely untenable as he was to be initially at least responsible for four of the six actions required to effectuate the proposals.

While the scheme to set up a phony lumber company in Mexico as a cover for the helicopter operation may look Rube Goldbergian to some of us, the jury could have believed it was not insuperably difficult in Jones' eyes. Still, it did present complications and it is no wonder Jones wanted the deep-pockets partner to go on the ground and be satisfied to incur the necessary large expense. In Mexico, as in most other countries, government authorities want to know all about businesses that foreigners plan to set up in their territories. There would be tax, labor law, immigration, and doubtless many other problems. For the cover business to be plausible, there would have had to be a lumber supply in hauling which the helicopters could be usefully employed. We do not find in the evidence just what the helicopters would do with the lumber, but take judicial notice that helicopters are actually employed to remove fresh-cut timber from forests without use of logging roads. At any rate, the proposal that Segarra investigate on the ground was the impasse that wrecked the negotiations. Segarra would not go, and Jones would not agree unless he went.

## Discussion

■ This is a very fact-specific case. We have to start with this basic legal assumption: given an indictment for conspiracy under the statutes invoked by the grand jury in this case, an overt act is not a necessary component of the crime, but there must be an "agreement." *United States v. Elledge*, 723 F.2d 864 (11th Cir. 1984). The government relies on this case more than any other. It too was a fact-specific case and no two cases have facts just alike: however, the government relies on this preliminary to the court's examination of the facts:

> The defendants argue that although there was a great deal of conversation about drugs, these discussions were only preliminary to, and did not result in, any final criminal agreement to import and distribute marijuana. We examine the evidence here in some detail to see whether there was some evidence of a conspiracy or only evidence of preliminary discussions without any illegal agreement.

*Id.* at 866.

The facts, very briefly, were that Elledge, a lawyer, and Poole, a marijuana dealer, were working on behalf of principals to obtain an aircraft and pilot who

might be employed to fly a cargo of marijuana from a source abroad. Elledge made proposals to a client that the client should find him someone. He was, he said, speaking on behalf of unnamed principals, one of whom was Poole. The client, being suspicious, elicited an admission of the purpose and later carried on discussions while provided with recording devices by the FBI. Eventually a plane flown by a DEA agent was caused to appear, but the pilot miscarried in the end because the backers withdrew their support. No final arrangement with the pilot to import the drugs was ever made, nor was there any certainty as to the source, financial backers, security system, and pickup and landing ports. But the court said "[a] complete detailed agreement is not necessary to convict persons of conspiracy." *Id.* at 868.

This case teaches not only that a plan may be pretty half-baked and still be a criminal conspiracy if the intentions of the participants are illicit, but also that sheer impossibility is no defense. As the defendants had selected an undercover government agent as their pilot, success would inevitably have eluded them even had their backers not withdrawn. The methods employed by courts to assess rights and liabilities under legitimate contracts are not to be used in determining the existence of an "agreement" constituting a criminal conspiracy.

Appellant places like reliance on *United States v. Melchor-Lopez*, 627 F.2d 886 (9th Cir.1980). The conviction of the named defendant was reversed because he imposed upon his "agreement" to sell heroin, a condition never accepted, namely that the buyers should come to Mexico to obtain heroin from him, and he would not carry it into the United States. As to another defendant, Kommatis, whose conviction was also reversed, the court seemed to believe his undertaking to join the conspiracy was not sufficiently specific, though it conceded the requirements of an enforceable contract were inapplicable. *Id.* at 890. It seemed to require an "agreement" to purchase a specific amount of contraband at a specific price. It seemed to look for a "meeting of

the minds," *id.* at 892, conventional contract language, though it conceded that the agreement could be inferred from circumstances. It distinguished between an "agreement" and an agreement to negotiate an agreement.

That case we believe should be cited with caution in this circuit, particularly the portion relating to Kommatis. However, the reason given for acquitting Melchor-Lopez seems to us unquestionably valid, and it should be one foundation point for our reasoning in this case. Courts should not use the term "agreement" and then define it out of existence.

Our analysis of our case starts with the definition of what the "conspiracy" was. It could not be "agreement" with Segarra for (1) none was reached, and (2) a federal narcotics agent working undercover cannot be a co-conspirator. It could only be agreement between Jones and Brown among themselves or including Jones' employee, O'Brien, also. Statements of all three to Segarra indicate that they had come to an understanding among themselves before Jones put specific proposals before Segarra. What that understanding was the jury could only infer from what Jones proposed. It could infer that if Segarra acquiesced, and contributed the necessary funds, and satisfied them by going to Mexico that he was truly convinced and committed, they would do what they proposed to do, *i.e.*, acquire the necessary helicopters, organize the "phony" lumber business in Yucatan, move the contraband cargo along the passage or over the peninsula by helicopter, and unlade Segarra's vessel on arrival at west Florida. A conclusion by the jury that this was their agreement, beyond a reasonable doubt, would have the support of ample evidence. A conclusion that they were conspirators with a complete plan looking for no more than a financial backer, that they would do whatever Segarra did not do, or that they could have, would have, or did, submit the same or similar proposals to anyone else, would lack the support of substantial evidence. If such

conclusions are necessary to sustain the verdict, then the verdict cannot stand.

It is quite clear that the proposals resulted from Segarra's own account of his then resources, which included at least a shrimper and a cargo of 40,000 pounds of marijuana, and his problem, that the Yucatan passage was too "hot" because of Coast Guard presence to be useable as a route to approach the United States. (Apparently, though not stated expressly, other alternative routes were also "hot," hence Segarra's new interest in the Florida west coast, previously neglected by him.) If the jury could have inferred that, rebuffed by Segarra, Jones and Brown could have, would have, or did, submit proposals to others, their content is mere speculation and guess, with no evidence in the record, except that surely what was to be done by themselves and by others would have been different and therefore would have required a new "agreement." There is no evidence, circumstantial or otherwise, that they agreed to submit to anyone proposals other than the ones they submitted to Segarra, or that they had or would have maintained any kind of partnership or joint venture except the one their proposals to Segarra, if accepted, would have brought into existence. There is, in fact, nothing in the record, express or circumstantial, to show that Jones and Brown ever even exchanged two words after April 29, to the close of the conspiracy period as stated in the indictment, July 28. As Segarra stated on April 29 to Jones, he wanted to think about it, so presumably Jones would allow time to pass before he knew he would have to peddle his conspiracy somewhere else to make anything of it.

■ The legal question then is, whether an "agreement" to submit proposals to a third party, with preconditions never accepted, can be all by itself such an "agreement" as the law denounces as a criminal conspiracy? A "bright line" is difficult to draw because agreements calling on the parties to do certain things, such as to raise working capital by borrowing, might be more consistent with the idea of an ongoing criminal agreement than the proposals we have here. In general, measures to raise money, recruit personnel, or purchase needed material, might be consistent with the inference of an agreement by which the same conspiracy would continue despite rebuffs of individual proposals by third parties. Where we have specially tailored proposals such as those shown here, the inference of a continuing agreement from the mere making of such proposals is so tenuous the requirement of proof beyond a reasonable doubt precludes us from so inferring. Of course, the law could be written to punish one who seriously contemplated participating in a drug smuggling enterprise, but it has not yet done so, and as appellant argues, when the "overt act" is dispensed with, the need for specificity as to who agrees to do what becomes greater. We cannot say the mere submission of proposals such as we have here, with preconditions not met, is a criminal conspiracy without more. The *Melchor-Lopez* case holds that a partial acceptance of proposals, but stating a precondition not met, is not a conspiracy. We think this is sound and it follows that the mere submission of proposals, incorporating a precondition not met, is not a conspiracy either when the circumstances do not justify an inference of fact that the "agreement" survives the rebuff. This suffices to dispose of this case.

## Conclusion

We conclude that the verdict of guilty is not supported by the evidence. The motions for directed verdict at the close of the government case should have been granted. The judgment of conviction of Calvin Jones is reversed.

REVERSED.