[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 24, 2011
JOHN LEY
CLERK

_____

No. 09-15258
Non-Argument Calendar

_____

D. C. Docket No. 09-20468-CR-PCH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSCAR GONZALEZ,
CORY CORTES,
DARRELL BROWN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 24, 2011)

Before TJOFLAT, CARNES and FAY, Circuit Judges.

PER CURIAM:

Oscar Gonzalez, Cory Cortes, and Darrell Brown appeal their convictions and sentences for conspiracy to possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii). On appeal, all three defendants contend that the evidence introduced at trial was insufficient to support their convictions. In addition, Cortes and Brown assert that the district court erred when it: (1) permitted a government witness to offer a legal conclusion that the defendants had entered into a conspiracy, (2) allowed the government to introduce Cortes's prior conviction for conspiracy to steal U.S. mail into evidence under Fed.R.Evid. 404(b); and (3) denied their motion for disclosure of the government's confidential informant ("CI").[1] Cortes and Brown additionally contend that cumulative error requires that they be given a new trial.

Brown and Gonzalez also challenge their respective sentences. Brown argues that he should not have received an enhanced sentence based on a prior drug conviction because he was not given adequate notice of the government's 21 U.S.C. § 851 information, and because the § 851 information itself was defective. Brown also contends that his enhanced sentence violates the Eighth Amendment because his prior conviction was for a relatively minor offense for which he only served two days in prison. Gonzalez argues that the district court erred in holding

---

[1]Gonzalez has not adopted Cortes's and Brown's arguments with respect to these issues.

him accountable for 20 kilograms of cocaine and by imposing a 2-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon.[2] For the reasons stated below, we affirm.

## I.  Facts

### A.  Trial Evidence

A federal grand jury charged Cortes, Brown, and Gonzalez with one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii) (Count One), and one count of attempted possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii) (Count Two).  The charges in this case arose out of an undercover "reverse sting" operation conducted by the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and the Miami-Dade Police Department.  The government's case was based on the testimony of an undercover detective, Juan Sanchez, and video and audio recordings of meetings between Sanchez, the defendants, and a CI.

On January 7, 2009, the CI introduced Gonzalez to Sanchez, who was playing the role of a drug courier for a Colombian cocaine-trafficking organization. Sanchez told Gonzalez that he was upset with his employer because he had not

_____

[2]Cortes and Brown have not adopted the sentencing issues raised by Gonzalez.

3

been paid for the last two shipments. Sanchez stated that he wanted someone to rob his employer's stash house when the next shipment of cocaine arrived.

Gonzalez indicated that he and his crew were willing and able to carry out the robbery. He explained that his men would enter the stash house "dressed as police . . . and with rifles in their hands." Gonzalez emphasized that his men were experienced and would be prepared to use force if they encountered resistance. One week after the initial meeting, however, Gonzalez informed Sanchez that he could not go through with the robbery because his crew had been arrested by the police. At that point, the investigation into Gonzalez was terminated.

Several months later, Gonzalez told the CI that he had gathered a new crew and was again interested in committing the robbery. On April 24, 2009, the CI called Cortes in order to arrange a meeting between Cortes and Sanchez. Cortes stated that he would bring "the people I'm gonna do the job with" to the meeting. During a subsequent phone conversation, Cortes expressed concern about possible police involvement. The CI told Cortes that he should not participate if he was worried about the police. The CI had been instructed to make that statement to give Cortes an opportunity to withdraw if he did not want to go forward with the robbery. Cortes told the CI that he was a man of his word, and that the CI should "call me up when you're ready to do this . . ."

On April 27, 2009, Sanchez met with the CI, Cortes, and Brown.  At the beginning of the meeting, Sanchez described the robbery scenario to Cortes and Brown.  He explained that his employer shipped cocaine from Colombia to Miami, and that it was his job to unload the planes and transport the drugs to stash houses.  Sanchez stated that the location of the stash house changed for each delivery.  After unloading the cocaine at the airport, he would take it to his office and call his employer to get the address of the stash house.  Previous shipments had ranged in size from 15 to 20 kilograms of cocaine, and Sanchez estimated that the next shipment would include 20 kilograms of cocaine.

Sanchez suggested that Cortes and Brown could follow him from his office to the stash house to steal the cocaine.   He explained that he wanted the robbery to occur while he was inside the house so that he would not be forced to pay for the drugs.  He stated that there were usually two or three people in the house, one of whom was armed.  Brown suggested that the best idea would be for him and Cortes to rob Sanchez as he was getting out of his car.  At the conclusion of the meeting, the CI told Cortes and Brown to let him know if they did not want to be involved in the robbery, but Brown responded, "Ah, no . . . we going to do it."

Sanchez met with Cortes and Brown for a second time on May 6, 2009.  During that meeting, Sanchez stated that the next shipment of cocaine would arrive

5

in two weeks. He reported that the shipment would consist of at least 15 kilograms of cocaine, and might be even larger. Sanchez asked, "So what do you guys think, it feel good?" Brown responded, "Yeah." The group then discussed Brown's plan to rob Sanchez as soon as his car pulled up in front of the stash house. Brown observed that he could shoot at Sanchez's truck in order to cause a commotion.

On May 7, 2009, the CI called Gonzalez and asked him whether he personally would be participating in the robbery. Gonzalez stated that he would be "supervising outside" while Cortes and Brown carried out the robbery. On May 8, the CI called Cortes and Gonzalez and informed them that the cocaine would arrive in Miami the following Thursday. The CI also arranged another meeting between the defendants and Sanchez.

On May 13, 2009, Sanchez and the CI met with Cortes and Brown. Sanchez explained that his employer would be sending a shipment of 20 kilograms of cocaine to Miami the next day. The CI told Cortes and Brown to let him know if they did not want to go through with the robbery. Sanchez then asked, "We're good, though, right, for tomorrow?" Brown responded, "Yeah." The CI observed that Cortes and Brown still had time to change their minds, but Brown stated, "No, we good."

The group then discussed the details of the robbery. Gonzalez arrived at the

meeting midway through the discussion. Brown stated that he would be wearing a t-shirt tied around his face as a mask. He also explained that he would either shoot at Sanchez or hit him during the robbery attempt. Later, Brown suggested that he could simply make a screeching sound with his tires. Towards the end of the meeting, Sanchez repeated that the shipment would include 20 kilograms of cocaine. Cortes mentioned that he had already found a buyer for his share of the cocaine.

On May 14, 2009, the day planned for the robbery, the CI called Cortes and Gonzalez, and told them to meet him at a Sports Authority parking lot. The plan was for the CI to drive Cortes, Brown, and Gonzalez to Sanchez's office. After Sanchez loaded the cocaine into his vehicle, Cortes and Brown would follow him to the stash house to carry out the robbery. While the CI was waiting, Cortes called him and apparently expressed reservations concerning the meeting. When Brown and Cortes arrived, the CI asked Brown what was wrong with Cortes. Brown responded, "I don't know, man." The CI asked Cortes if he was "straight," and Cortes replied, "Yeah." As they waited for Gonzalez to arrive, the CI again asked what was wrong with Cortes. Brown stated, "Hey, you know, he ain't used to it, I'm ready."

After Gonzalez arrived, the CI began driving towards Sanchez's office.

While they were en route, the CI asked whether Cortes was all right, and Cortes said, "Yeah I'm good bro. I'm good, I'm good, I'm good." The CI explained that the cocaine would be split "ten for us and ten for them." Brown indicated that he had a buyer who would give him "twenty-eight" for his share.

After the group arrived at Sanchez's office, Cortes asked Brown, "You straight?" Brown responded, "Hey man if they was trying to catch us with a gun they would have roped us off already . . . Glad we gonna get this money . . . this is a good call? . . . I don't know . . . you don't think it's a good call?" Cortes replied, "Yeah it's a good call." At that point, agents moved in and placed the defendants under arrest. As Brown got out of the vehicle, one of the arresting agents noticed a firearm fall out of his waistband onto the ground. Closer inspection revealed that the item was a Powerline air pistol. The agents also found gloves and black t-shirts in the vehicle or on the defendants' persons.

After the government rested its case, the defendants moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The district court denied the motion. The defendants rested without presenting any evidence. The jury convicted the defendants with respect to Count One, the conspiracy charged, but acquitted the defendants with respect to Count Two, the attempt charge.

8

**B. Sanchez's Testimony That the Defendants Entered into a Conspiracy**

During Detective Sanchez's direct testimony, the prosecutor asked him why Cortes and Brown had not been arrested at the April 27 meeting. Sanchez explained, "At that time they had not committed any overt act to try to do this. Plus, we want to give them the opportunity to stay out of this." Later, the prosecutor asked why the defendants had not been arrested following the May 13 meeting. Sanchez again explained that the defendants had not yet committed an overt act.

On cross-examination, Gonzalez's counsel asked Sanchez whether any of his client's conduct prior to the May 13 meeting rose to the level of an overt criminal act. The prosecutor objected that the question called for a legal conclusion, but the district court overruled the objection. Sanchez testified that Gonzalez had not committed an overt act towards the theft of the drugs prior to May 13, but he had been involved in a conspiracy:

| | |
|---|---|
| DET. SANCHEZ: | Sir, all the time your client was involved in a conspiracy to commit a crime. As far as law enforcement is concerned, we have to take it to the overt act, which was the day he showed up to commit the robbery. All those meetings, that's a conspiracy, sir. |
| GONZALEZ'S COUNSEL: | Up to that time, if an overt act does |

not happen while meeting in a criminal meeting, it does not rise to the level of a criminal conspiracy.

THE PROSECUTOR: Objection, calls for a legal conclusion.

THE COURT: Why don't you ask it a different way about his personal experience or something that relates to what he knows.

GONZALEZ'S COUNSEL: Up to the 13th, sir, there was no conduct that rose to the level of an indictment - -

DET. SANCHEZ: No, sir, you're wrong. Up to that date, your client was involved in a conspiracy. What I said was he had not committed an overt act.

Had we terminated the case before the last meeting, it would have been up to a U.S. Attorney to charge him with a conspiracy. As far as I was concerned, he was involved in a conspiracy.

GONZALEZ'S COUNSEL: But your testimony was that no overt act occurred prior to 5/13?

DET. SANCHEZ: No overt act into the theft of the drugs. He had been involved in a conspiracy.

GONZALEZ'S COUNSEL: But you did not say that prior.

DET. SANCHEZ: No, the question was, why didn't we arrest him at the time? I said at that

10

time there was no overt act until the theft of the drugs, sir, but there was a conspiracy.

Neither Cortes nor Brown objected to this line of questioning.

## C. Admission of Cortes's Prior Conviction under Fed.R.Evid. 404(b)

Prior to trial, the government notified the defendants that it intended to introduce evidence that Cortes had a prior conviction for conspiracy to steal U.S. mail. The government explained that it would be offering that evidence under Fed.R.Evid. 404(b) to establish that Cortes knew about the charged crimes, that he intended to commit the crimes, and that his participation was not the result of an accident or mistake. The government also observed that Cortes's prior conviction would be relevant to rebutting any entrapment defense.

In his opening statement, Cortes explained that the defendants had participated in the preliminary meetings concerning the robbery because they were intrigued by the possibility of making easy money, but he asserted that the defendants had never reached a final agreement to commit the robbery. He argued that the government had "dangled a million dollar golden carrot in front of these two young boys," and that this case was "about the United States Government trolling in poor neighborhoods, going after poor kids, offering them a million dollars for nothing and bringing them into court and prosecuting them."

11

At the conclusion of the first day of trial, the government asserted that Cortes had opened the door with respect to his prior conviction by offering an entrapment defense in his opening statement. Cortes did not offer any argument in response. The district court agreed that Cortes's opening statement "was the making of a classic entrapment case." The court ruled that it would admit the prior conviction, subject to a limiting instruction.

The next day, Cortes stated that he should have objected to the introduction of his prior conviction. Cortes argued that he had not opened the door with respect to that conviction because he had not raised a *prima facie* case of entrapment in his opening statement. The government responded that Cortes's opening statement set forth a "pseudo layman's entrapment defense." The government also argued that the prior conviction was also admissible under Rule 404(b) because it was relevant to Cortes's knowledge and intent. The district court ultimately ruled that it would admit the prior conviction under Rule 404(b), subject to a limiting instruction.

At the conclusion of its case, the government introduced the record of Cortes's prior conviction into evidence. The district court instructed the jury that it could not consider the prior conviction in determining whether Cortes committed the acts charged in the indictment, but it could consider that conviction for the limited purpose of determining whether Cortes had the state of mind or the intent

12

necessary to commit the charged offenses. The government did not mention Cortes's prior conviction during its closing argument. Cortes briefly asserted in his closing argument that the government brought in his prior theft conviction because of the weakness of its case against him.

### D. Motion for Disclosure of CI

On June 3, 2009, the district court entered a standing discovery order that set a deadline of 28 days for pretrial motions. On July 23, 2009, after the motions deadline had run and less than one week before trial, the defendants filed a motion for disclosure of information concerning the government's CI. The defendants argued that the CI's identity and prior activities were relevant to an entrapment defense and also could be used for impeachment purposes. The government opposed the motion, arguing that the defendants' need for the requested information did not outweigh its interest in protecting the safety and usefulness of the CI.

The district court addressed the motion for disclosure at a July 24, 2009, hearing. As an initial matter, the court noted that the motion was untimely. The court observed that the defendants had known about the CI's existence "from day one." Cortes stated that the defense had filed the motion because the government had been late in providing discovery. He asserted that the government only

13

recently disclosed that the CI had paid money to Cortes without prior authorization from law enforcement. The government explained that Cortes was referring to an incident where the CI had given him $20 in gas money. The government argued that there was no need to disclose the CI's identity because the case agent would be available to testify concerning that incident. The government also was willing to stipulate that the CI was a paid informant. The parties eventually agreed to stipulate that the CI had given Cortes $20 in gas money without the prior approval of the case agent.

Cortes argued that the government should also be required to disclose information about the CI's identity and background for impeachment purposes. Although the CI was not going to be a witness at trial, Cortes noted that certain hearsay statements made by the CI were going to be introduced into evidence. Therefore, he asserted, the defense had the right to impeach the CI's credibility under Fed.R.Evid. 806.

The district court concluded that the CI's statements were not hearsay because they were being introduced as "representations of the conversations," rather than for the truth of the matter asserted. The court stated that it would read the parties' stipulation concerning the gas money, but would not allow any additional disclosure concerning the CI unless the government decided to call the

14

CI as a witness. The court explained that it was denying the motion both on procedural grounds because it was untimely, and on the merits.

### E. Sentencing Facts

Two weeks prior to trial, the government filed a 21 U.S.C. § 851 information with respect to Brown. The government explained that Brown had two prior felony drug convictions: a 1996 Florida conviction for felony possession of cocaine, and a 1998 South Carolina conviction for felony possession of cocaine. The government attached a certified copy of the judgment for Brown's 1996 Florida conviction to the information. The judgment reflected that Brown pled guilty to possession of cocaine, a third-degree felony, and was sentenced to time served after spending two days in prison. The government filed the § 851 information using the district court's electronic CM/ECF system.

Brown initially was represented by an appointed attorney, Charles Everett. On July 20, 2009, one week before trial, Brown moved to substitute David Pettus as his defense counsel. Pettus explained that he already had familiarized himself with the case and had reviewed the docket sheet and all previously filed motions. Pettus stated that he would be ready to try the case on July 27. The district court granted the motion to substitute counsel and directed Everett to forward immediately all of his information concerning the case to Pettus.

In calculating Gonzalez's guideline range, the presentence investigation report ("PSI") determined that he was responsible for 20 kilograms of cocaine, giving him a base offense level of 34 under U.S.S.G. § 2D1.1. The PSI then imposed a two-level enhancement for possession of a dangerous weapon under § 2D1.1(b)(1). The PSI also applied a 2-level role enhancement under U.S.S.G. § 3B1.1(c) for being a leader, organizer, manager, or supervisor of a criminal activity, giving Gonzalez a total offense level of 38. Gonzalez had a criminal history category of I. These calculations resulted in a guideline range of 235-293 months' imprisonment.

Gonzalez objected to the PSI's calculation of drug quantity. He explained that the meetings and discussions only referenced 15 kilograms of cocaine, rather than 20 kilograms. Next, Gonzalez argued that he should have received a reduction for acceptance of responsibility. He additionally asserted that the two-level enhancement under § 2D1.1(b)(1) for possession of a dangerous weapon was inappropriate because he had not been aware that one of his codefendants was carrying an air gun. Gonzalez also objected to the two-level role enhancement under § 3B1.1(c).

At the sentencing hearing, the district court afforded the defendants an opportunity to make a statement accepting responsibility for their offense, and then

16

granted all three defendants a two-level reduction under U.S.S.G. § 3E1.1(a).  The government then observed that it had filed a 21 U.S.C. § 851 information with respect to Brown, and, as a result, Brown was facing an enhanced mandatory minimum sentence of 20 years.  Brown's counsel, Pettus, responded that he had not been aware of the § 851 information because he was not retained until shortly before trial.  Pettus was unsure whether the information had been properly filed.  In addition, Pettus explained that Brown's former attorney, Everett, had never told Brown that he would be facing an enhanced sentence.  Pettus argued that the § 851 information was invalid because Brown had not been given proper notice of it.

The district court ruled that Brown had been given sufficient notice of the information because it had been filed on the court's docket sheet, and was available for Brown or his counsel to review.  Pettus acknowledged that he had been remiss in not reviewing all of the previously filed documents after he was retained as counsel.  The district court noted that Brown might be able to raise a claim with respect to the § 851 information in a collateral proceeding, but it concluded that it was bound by the § 851 information for the purpose of determining Brown's sentence.  The district court sentenced Brown to the mandatory minimum term of imprisonment, 240 months.

With respect to Gonzalez's sentence, the court first addressed Gonzalez's

17

objection to the enhancement for possession of a dangerous weapon. The court observed that the black air pistol recovered by law enforcement qualified as a dangerous weapon because it resembled a firearm. In addition, the court concluded that it was reasonably foreseeable to Gonzalez that one of his codefendants would be carrying a firearm because he was involved in a conspiracy to rob a substantial amount of cocaine from a drug dealer.

Next, the district court considered Gonzalez's objection to the PSI's calculation of drug quantity. Gonzalez asserted that the only amount mentioned in the preliminary meetings was 15 kilograms, and that no one had referred to 20 kilograms until the CI and the defendants were driving towards the purported stash house. In response, the government noted that Detective Sanchez had referred to 20 kilograms of cocaine at the May 13, 2009, meeting, and that the CI had referenced 20 kilograms of cocaine on May 14, the day when the defendants were arrested. The district court also observed that the CI told Gonzalez that the cocaine would be split "ten for us, ten for them." The court recognized that various amounts of cocaine had been discussed during the meetings, but it concluded that the defendants had believed that the actual robbery would involve a total of 20 kilograms.

The district court sustained Gonzalez's objection to the PSI's role

18

enhancement. In light of the court's rulings at sentencing, Gonzalez had a guideline range of 121-151 months' imprisonment. The district court also determined that Gonzalez was eligible for safety valve relief. After hearing arguments concerning the 18 U.S.C. § 3553(a) factors, the court varied downward from the guideline range and sentenced Gonzalez to 110 months' imprisonment.

## II. Sufficiency of the Evidence

We review *de novo* whether there is sufficient evidence to support the jury's verdict in a criminal case. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). We "view[] the evidence in the light most favorable to the government, and draw[] all reasonable factual inferences in favor of the jury's verdict." *Id.* Evidence is sufficient to support a conviction where "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* at 1284-85 (quotation omitted).

To convict a defendant of conspiracy, the government must show: "(1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998). The government may prove the existence of an illegal agreement through circumstantial evidence, including the conduct of the individuals allegedly involved in the scheme. *United States v.*

19

*Seher,* 562 F.3d 1344, 1364 (11th Cir. 2009).

The fact that an agreement is subject to a condition precedent "does not make it any less an agreement." *United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir. 1980) (affirming conspiracy conviction where defendant helped to plan a marijuana importation scheme, but stated that he would not follow through with the plan until he was satisfied that he was not dealing with an undercover officer). On the other hand, no conspiratorial agreement arises when a party merely offers proposals that are never accepted by the other party. *United States v. Jones*, 765 F.2d 996, 1003 (11th Cir. 1985). In *Jones*, we held that no conspiratorial agreement came into being where the alleged conspirators agreed amongst themselves to submit proposals for a drug conspiracy to an undercover agent, but there was no evidence that the conspirators agreed to go forward with the plan after the agent rejected their proposals. *Id.* at 1001-03.

Here, a reasonable fact-finder could conclude that Cortes and Brown entered into an agreement to commit the cocaine robbery. During the preliminary meetings, Detective Sanchez and the CI offered Cortes and Brown several opportunities to back out of the scheme, but they repeatedly stated that they were prepared to go forward with the plan. Specifically, at the April 27 meeting, the CI told Cortes and Brown to let him know if they were not interested in the proposal,

but Brown responded that they were "going to do it." On May 6, Sanchez asked Brown and Cortes if the plan felt good, and Brown responded, "Yeah." During the May 13 meeting, Brown again assured Sanchez that he and Cortes were prepared to go forward with the robbery.

Although Cortes and Brown expressed some doubts about the scheme at various points, a jury could infer from their actions that they still intended to carry out the robbery despite their concerns. The plan called for Cortes and Brown to follow Sanchez from his office to the location to the stash house. On May 14, the day scheduled for the robbery, Cortes and Brown met with the CI and drove to Sanchez's office. They brought with them an air gun and black t-shirts that they planned to use as masks. Because Cortes and Brown took all of the preliminary steps necessary to carry out the robbery, a reasonable jury could infer that they had reached an agreement to go forward with the plan. *See Seher*, 562 F.3d at 1364. Also, Brown and Cortes mentioned that they already had found buyers for their portions of the cocaine, which further demonstrates that they intended to proceed with the robbery.

A reasonable fact-finder also could conclude that Gonzalez agreed to commit the cocaine robbery. In January 2009, Gonzalez told the undercover detective, Sanchez, that he and his crew would carry out a home invasion-style

21

robbery of the stash house. After that initial plan fell through due to his crew's arrest, Gonzalez gathered a new crew and informed the CI that he was still interested in committing the robbery. Although Gonzalez did not participate in the initial meetings between Cortes, Brown, and Sanchez, he later told the CI that he would be "supervising" the robbery from outside. On May 14, the day when the cocaine was supposed to be delivered, Gonzalez met with Cortes and Brown and traveled with them to Sanchez's office. Because Gonzalez expressed continued interest in committing the robbery, and because he joined Cortes and Brown as they carried out the initial step in the plan, a reasonable jury could conclude that Gonzalez intended to go forward with the robbery scheme. *See Seher*, 562 F.3d at 1364.

The fact that the defendants suggested alternative methods of committing the robbery does not indicate that there never was a conspiratorial agreement. *See Grassi*, 616 F.2d at 1302. To the contrary, a jury could conclude from the defendants' willingness to make detailed plans that they were serious about committing the robbery. This case is distinguishable from *Jones* because the defendants did more than submit proposals to an undercover detective. *See* 765 F.2d at 1001-03. They affirmatively agreed to Sanchez's proposal, planned how the robbery would be carried out, and were in the process of following through

with the early stages of the plan when they were arrested.   Because a reasonable jury could have concluded that the defendants entered into a conspiratorial agreement to possess cocaine, their convictions were supported by sufficient evidence.  *See Jiminez*, 564 F.3d at 1284-85.

### III.  Admission of Sanchez's Testimony

Because Cortes and Brown did not object when Gonzalez asked Sanchez whether the defendants had committed a criminal act, we are reviewing that portion of Sanchez's testimony only for plain error.  *See United States v. Habel*, 613 F.2d 1321, 1326-27 (5th Cir. 1980) (applying the plain-error standard where the prosecutor, but not the defendant alleging error on appeal, objected to a codefendant's proposed line of cross-examination).  Under the plain-error standard, the defendant must show "(1) error, (2) that is plain and (3) that affects substantial rights."  *United States v. Turner,* 474 F.3d 1265, 1276 (11th Cir. 2007) (quotation omitted).  If all three of those conditions are met, we have discretion to correct an error that "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quotation omitted).

To demonstrate that an error affected his substantial rights, a defendant must show that it had a significant influence on the outcome of the case.  *Id.*  We will not reverse an evidentiary ruling under the plain-error standard if the other

23

evidence of the defendant's guilt was overwhelming. *See id.* at 1278-80

(concluding that the district court's error in admitting testimony did not affect the

defendant's substantial rights because there was overwhelming independent

evidence that the defendant was part of the charged conspiracy). Also, when a

party chooses not to object to evidence for tactical reasons, we generally will not

conclude that the admission of that evidence was plain error. *See Habel*, 613 F.2d

at 1327-28 ("When a lawyer, for strategic reasons, chooses to by-pass the

appropriate procedures for informing the trial court of contemporaneous errors, he

will not be heard to complain when his strategy backfires.").

Under the Federal Rules of Evidence, a witness may testify concerning an

ultimate issue of fact, but may not "tell the jury what result to reach." *See*

*Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)

(addressing the permissible scope of expert testimony under Fed.R.Evid. 704). "A

witness also may not testify to the legal implications of conduct; the court must be

the jury's only source of law." *Id.* Thus, a government witness may not offer an

opinion as to whether the defendant committed the offenses with which he is

charged. *Cf. United States v. Gutierrez-Farias*, 294 F.3d 657, 662-63 (5th Cir.

2002) (agent's testimony that, in most cases, individuals who transport drugs know

that the drugs are in the vehicle crossed the line between a permissible expert

24

opinion and an improper legal conclusion); *United States v. Scop*, 846 F.2d 135, 138-43 (2d Cir. 1988) (investigator's testimony that a scheme to defraud existed and that the defendants were active participants in the scheme was an improper legal conclusion concerning the defendants' guilt).

In this case, neither Cortes nor Brown objected when Gonzalez's counsel asked Detective Sanchez whether Gonzalez had committed a criminal act before May 13. Because the record shows that Cortes's and Brown's counsel were attentive throughout trial, it appears that they chose not to object to this line of questioning for tactical reasons. *See Habel*, 613 F.2d at 1327 (concluding that, where counsel had been attentive throughout trial, counsel's failure to object was for strategic reasons). Presumably, they believed that the line of questioning would be helpful to their defense. Having made an affirmative decision not to object, Cortes and Brown cannot argue that the admission of this testimony was plain error. *See id.*

Even if Cortes and Brown had not waived this issue by failing to object, any error did not affect the defendants' substantial rights because the government introduced considerable independent evidence of their guilt. *See Turner,* 474 F.3d at 1278-80. In particular, the government established that Cortes and Brown repeatedly stated that they wished to go forward with the robbery scheme. Also, at

25

the time of their arrest, Cortes and Brown were at Sanchez's office preparing to follow him to the purported stash house, and they were in possession of an air pistol and black t-shirts that Brown planned to use as a mask. Given this evidence, the outcome of the trial would not have changed had the district court excluded Sanchez's testimony that the defendants entered into a conspiracy.

## IV. Rule 404(b) Evidence

We review a district court's admission of prior crimes or bad acts under Rule 404(b) for an abuse of discretion. *United States v. Phaknikone*, 605 F.3d 1099, 1107 (11th Cir. 2010), *petition for cert. filed*, (U.S. July 30, 2010) (No. 10-5864). A district court's evidentiary rulings are subject to a harmless-error analysis. *Id.* at 1109. An evidentiary error is harmless if it did not have a substantial and injurious effect on the jury's verdict. *Id.* "Overwhelming evidence of guilt is one factor that may be considered in finding harmless error." *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999).

Federal Rule of Evidence 404(b) provides that extrinsic evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake

26

or accident." *Id.* Evidence of prior crimes or acts may be admitted under Rule 404(b) if three requirements are met. *Phaknikone*, 605 F.3d at 1107. "First, the evidence must be relevant to an issue other than the defendant's character." *Id.* (quotation omitted). Second, "there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act." *Id.* (quotation omitted). Third, the probative value of the evidence must not be substantially outweighed by the danger of undue prejudice. *Id.*; *see also* Fed.R.Evid. 403.

We have explained that "[i]n every conspiracy case . . . a not guilty plea renders the defendant's intent a material issue." *United States v. Roberts*, 619 F.2d 379, 383 (5th Cir. 1980). Therefore, when a defendant goes to trial on a conspiracy charge, the government may introduce evidence of prior extrinsic acts if they are relevant to the defendant's state of mind, and if the defendant has not taken affirmative steps to take the issue of intent out of the case. *Id.* For a prior conviction to be relevant to the issue of intent, there must be a level of factual similarity between the prior conviction and the charged offense. *Compare United States v. Matthews*, 431 F.3d 1296, 1311 (11th Cir. 2005) (prior convictions for drug offenses are admissible to establish intent where the defendant is charged with another drug offense), *with United States v. Young*, 39 F.3d 1561, 1572-73 (11th Cir. 1994) (evidence that the defendant was involved in the illegal production of

27

alcohol was not probative of a defendant's intent to enter into a marijuana conspiracy because the two offenses were factually and legally distinct).

In this case, we need not decide whether the district court abused its discretion by admitting Cortes's prior conviction for conspiracy to steal U.S. mail because we agree with the government that any such error was harmless given the substantial evidence of the defendants' guilt. *See Guzman*, 167 F.3d at 1353. The government introduced numerous video and audio recordings of meetings where the defendants expressed a willingness to carry out the proposed drug robbery and discussed the details of how the robbery would be committed. When the defendants were arrested, they were carrying an air pistol and black t-shirts that Brown planned to use as a mask during the robbery.

It is also notable that Cortes's prior conviction did not form a critical part of the government's case. The government simply introduced the conviction into evidence at the conclusion of its case, and did not refer to it during closing arguments. Cortes even attempted to use the prior conviction to his advantage by arguing that the government had introduced that conviction because the other evidence of his guilt was weak. Under the particular facts of this case, the admission of Cortes's prior conviction did not have a substantial and injurious effect on the jury's verdict. *See Phaknikone*, 605 F.3d at 1109. Accordingly, any

28

error in admitting the prior conviction was harmless.

## V. Denial of Motion for Disclosure of CI

A district court's denial of a motion as untimely is reviewed for an abuse of discretion. *United States v. Snipes*, 611 F.3d 855, 864 (11th Cir. 2010). The Federal Rules of Criminal Procedure provide that a district court may set a deadline for the filing of all pretrial motions and requests. Fed.R.Crim.P. 12(c). Any motions not filed by the deadline are considered to be waived. Fed.R.Crim.P. 12(e). The waiver rule applies even if the district court made an alternative ruling on the merits of the motion. *United States v. Milian-Rodriguez*, 828 F.2d 679, 683-84 (11th Cir. 1987). The district court may grant relief from the waiver if the party is able to show good cause for the late filing. Fed.R.Crim.P. 12(e).

In this case, the district court did not abuse its discretion in finding that the defendants' motion for disclosure of the CI was untimely. *See* Fed.R.Crim.P. 12(e). The district court's June 3, 2009, scheduling order set a deadline of 28 days for the filing of all motions. The defendants' motion for disclosure was not filed until July 23, 2009, three weeks after the deadline had run and less than one week before trial.

Furthermore, the defendants did not offer good cause to excuse the late filing. *See* Fed.R.Crim.P. 12(e). Cortes's counsel explained that the motion was

29

late because the government had only recently disclosed that the CI had given gas money to Cortes. As the district court observed, however, the defendants had known about the CI's involvement "since day one." If the defendants believed that information concerning the CI was relevant to their defense, they should have filed the motion for disclosure at an earlier date. Because the district court properly denied the motion for disclosure as untimely, we need not address the district court's alternative conclusion that the motion failed on the merits.

## VI. Cumulative Error

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted). Where there are no errors or only a single error, there can be no cumulative error. *United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004). In this case, Cortes and Brown possibly have shown one potential harmless error concerning the admission of Cortes's prior conviction, but they have not established that the district court committed any other errors. Accordingly, Cortes and Brown have failed to establish cumulative error. *See id.*

## VII. Sentencing Issues

## A. Brown's Mandatory Minimum Sentence

We review the adequacy of a 21 U.S.C. § 851 information *de novo*. *United States v. Ramirez*, 501 F.3d 1237, 1239 (11th Cir. 2007). The notice requirements of § 851 are jurisdictional. *United States v. Jackson*, 544 F.3d 1176, 1184-85 (11th Cir. 2008). In this case, Brown did not challenge the contents of the § 851 information at the sentencing hearing, but the jurisdictional nature of the § 851 notice requirement allows Brown to challenge the contents of the notice at any time. *See United States v. Giraldo-Prado*, 150 F.3d 1328, 1329 (11th Cir. 1998) (noting that "a party may raise jurisdiction at any time during the pendency of the proceedings"). Because Brown did not raise an Eighth Amendment objection before the district court, that argument is subject to plain-error review. *United States v. Raad*, 406 F.3d 1322, 1323-24 (11th Cir. 2005).

Section 851(a)(1) provides, in relevant part:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

21 U.S.C. § 851(a)(1). We have explained that the government must strictly comply with the requirements of § 851(a)(1). *Ramirez*, 501 F.3d at 1239. If the

government fails to do so, the district court lacks jurisdiction to impose an enhanced sentence. *Id.* A prior conviction may serve as the basis for a sentencing enhancement only if it is final, meaning that "all avenues of direct attack have been exhausted." *United States v. Lippner*, 676 F.2d 456, 467 (11th Cir. 1982). We have not, however, specifically held that an § 851 information must list the date on which the prior conviction became final.

We have determined that lengthy mandatory minimum sentences for recidivist drug offenders do not violate the Eighth Amendment. *See United States v. Willis*, 956 F.2d 248, 251 (11th Cir. 1992) (upholding mandatory life sentence for defendant with two prior felony drug convictions). More generally, the Supreme Court has indicated that the Eighth Amendment does not prohibit severe sentences for recidivist offenders even where the defendant's prior convictions are not particularly serious. *See Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). In *Rummel,* the Supreme Court upheld the constitutionality of a mandatory life sentence imposed on a defendant who had committed three fraud-related offenses that involved a total of less than $250. *Id.* at 265-66, 285, 100 S.Ct. at 1134-35, 1145. The Court explained that the state had an interest not only in punishing the particular crimes at issue, but also in incapacitating repeat offenders who have proved themselves incapable of conforming their conduct to

32

the law. *Id.* at 276, 100 S.Ct. at 1140. The Supreme Court also has held that lengthy sentences for first-time drug offenders do not violate the Eighth Amendment. *See Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (holding that a mandatory sentence of life imprisonment imposed on a first-time offender who was convicted of possessing 672 grams of cocaine did not violate the Eighth Amendment).

In this case, Brown was given sufficient notice of the government's intent to seek an enhanced sentence based on his prior Florida drug conviction. There is no merit to Brown's suggestion that the defendant personally must be served with a copy of the information because § 851(a)(1) specifically provides that the government may serve the information on either the defendant or his counsel. *See* 21 U.S.C. § 851(a)(1). Approximately two weeks before the trial began, the prosecutor filed an § 851 information using the district court's CM/ECF system. Brown's counsel at the time, Elliot, should have received an electronic notification that the information had been filed. Brown's sentencing counsel, Pettus, ultimately conceded that the notice was available via the district court's docket sheet. The district court did not err in concluding that the government had complied with the statutory notice requirements.

Next, Brown has not established error with respect to the contents of the

33

§ 851 information. The information set forth the date of Brown's Florida conviction, and a copy of the judgment was attached to the information. Brown is correct that the information did not refer to 21 U.S.C. § 841(b)(1)(A), nor did it state that the government would be seeking a 20-year sentence. However, the fact that the information listed two prior convictions put Brown on notice that the government would be requesting at least a 20-year sentence. Section 851(a) does not require that the information include the statutory section that authorizes an enhanced penalty or the exact length of the sentence that the government intends to seek. *See* 21 U.S.C. § 851(a)(1). Although the information did not list the date on which Brown's conviction became final, neither the statutory language nor this Court's case law requires such notice. *See id*. Moreover, Brown has not even argued that his prior Florida conviction was not final. Thus, Brown has not shown that the § 851 information was inadequate.

Finally, Brown's Eighth Amendment argument is foreclosed by precedent. Although Brown's prior conviction for third-degree felony possession of cocaine may have been relatively minor compared with other drug offenses, the Supreme Court has indicated that the Eighth Amendment does not prohibit a substantial term of imprisonment for recidivist offenders whose prior convictions are not serious. *See Rummel*, 445 U.S. at 276, 100 S.Ct. at 1140. Moreover, in *Harmelin*,

34

the Supreme Court upheld a sentence of life imprisonment without the possibility of parole for a first-time offender who possessed only 672 grams of cocaine. 501 U.S. 957, 111 S.Ct. 2680. Unlike Harmelin, Brown had a prior drug conviction, and he also was held accountable for a larger amount of cocaine than Harmelin. If Harmelin's sentence of life without parole did not violate the Eighth Amendment, Brown cannot show that his 20-year sentence violates the Eighth Amendment either, regardless of whether Brown's prior conviction was serious. Brown has failed to establish that his enhanced sentence constitutes cruel and unusual punishment, and, therefore, he cannot satisfy the plain-error standard with respect to his Eighth Amendment claim.

### B. Calculation of Drug Quantity Attributable to Gonzalez

We review a district court's calculation of drug quantity for clear error. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005). In a case where no drugs are actually seized, a district court should make a reasonable estimate based on the available facts. *Id.* Sentencing errors are harmless if they do not have a substantial effect on the defendant's sentence. *United States v. Foley*, 508 F.3d 627, 634 (11th Cir. 2007).

Here, during the May 13, 2009, meeting, Sanchez informed Gonzalez, Brown, and Cortes that the next shipment would include a total of 20 kilograms of

cocaine. On May 14, as the defendants and the CI were heading towards Sanchez's office, the CI explained that the cocaine would be split "ten for us and ten for them." Thus, the district court did not clearly err by concluding that Gonzalez was accountable for 20 kilograms of cocaine. *See Rodriguez*, 398 F.3d at 1296. Moreover, any error in the district court's calculation would be harmless because Sanchez never mentioned any amount below 15 kilograms, and, under the Sentencing Guidelines, a defendant responsible for 15 kilograms of cocaine is subject to the same offense level as a defendant who is accountable for 20 kilograms of cocaine. *See* U.S.S.G. § 2D1.1(c)(3); *Foley*, 508 F.3d at 634.

**C. Gonzalez's Enhancement for Possession of a Dangerous Weapon**

We review a district court's factual findings at sentencing for clear error, and the court's application of the Sentencing Guidelines to those facts *de novo*. *United States v. Pham*, 463 F.3d 1239, 1245 (11th Cir. 2006). Section 2D1.1(b)(1) of the Sentencing Guidelines provides that a defendant's offense level should be increased by two "[i]f a dangerous weapon (including a firearm) was possessed." A dangerous weapon is "an instrument capable of inflicting death or serious bodily injury," or any object that "closely resembles such an instrument." U.S.S.G. § 1B1.1 comment (n.1(D)). A defendant may be held liable for a co-conspirator's possession of a dangerous weapon if:

36

> (1) the possessor of the [weapon] was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant.

*United States v. Gallo*, 195 F.3d 1278, 1284 (11th Cir. 1999). When a conspiracy involves "trafficking in lucrative and illegal drugs," it is reasonably foreseeable that one of the conspirators may possess a firearm. *Pham*, 463 F.3d at 1246.

In this case, Gonzalez's co-conspirator, Brown, was found to be in possession of an air pistol that closely resembled a firearm at the time of his arrest. It was reasonably foreseeable to Gonzalez that one of his co-conspirators might possess a weapon because the conspiracy involved a plan to steal a large amount of cocaine. *See Pham*, 463 F.3d at 1246. During the January 7, 2009, meeting, Gonzalez explained that his crew would enter the house "dressed as police . . . with rifles in their hands," and would be prepared to use force if necessary. Although that initial plan fell through after Gonzalez's first crew was arrested, Gonzalez's statements show that he was aware that the robbery would be dangerous. We conclude that the district court did not err by enhancing Gonzalez's offense level for possession of a dangerous weapon.

## VIII. Conclusion

Upon review of the record on appeal and the parties' briefs, we affirm the

defendants' convictions and sentences.

**AFFIRMED.**