[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15635
_____

D.C. Docket No. 0:14-cr-60195-BB-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WENXIA MAN,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 6, 2018)

Before WILLIAM PRYOR, JILL PRYOR, and BLACK, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

Wenxia Man appeals her conviction and sentence for conspiracy to export

defense articles without a license or written approval in violation of the Arms

Control Export Act, 22 U.S.C. § 2778; *see also* 22 C.F.R. §§ 121.1, 123.1, 127.1.

Her appeal requires us to decide whether sufficient evidence supports her conviction, including the decision of the jury to reject her defense of entrapment; whether the district court abused its discretion in admitting evidence of the conspirators' communications; whether her sentence is procedurally and substantively reasonable; and whether the government failed to disclose exculpatory evidence, *Brady v. Maryland*, 373 U.S. 83 (1963). Between 2011 and 2013, Man participated in a series of discussions with Xingsheng Zhang, a Chinese operative; Jerry Liu, an undercover agent with the Department of Homeland Security; and an unnamed, unindicted person about how to purchase and export to China military aircraft engines, a military drone, and related technical data. Although the sale never occurred, the United States charged Man with conspiring to violate the Act. At trial, Man contended that insufficient evidence established a conspiracy and that she was entrapped. She also unsuccessfully objected to the admission of some of the conspirators' communications as either hearsay or prior bad acts. The jury convicted Man, and the district court sentenced her to 50 months of imprisonment after rejecting her argument that she was entitled to a downward adjustment for her minimal role in the scheme. On appeal, Man reiterates her earlier arguments and argues for the first time that the district court erroneously sentenced her on the basis of her national origin and that the government failed to provide her with a copy of an email. We affirm.

# I. BACKGROUND

We divide the background in two parts. First, we describe the facts. Second, we explain the procedural history.

## A.     *The Facts*

Wenxia Man is a resident and citizen of the United States who was born in China. She and her husband owned a company that produced electronic components for military applications. But her interest in military hardware went beyond this legitimate business.

On February 27, 2011, Man received an email from an account with the name "hrkj2006" that asked her about engines used in military aircraft. The email read as follows:

> Inquiry. Hi, Sister. Can you check if you are able to find the following [aircraft engines]: Manufacturer Lockheed Martin, Model 1, F100 Pratt & Whitney 229 or F110 General Electric 129. Two, F119 Pratt & Whitney 100 or F119 Pratt & Whitney 119, three pieces each.

Two days later, Man inquired about these engines in an email to Matthew McCauley, who worked for an international electronic sales company that distributed capacitors manufactured by Man's company. McCauley responded that he could "get [her] the[] engines, but [her] customer w[ould] need to pick them up in the United States." Man sent a reply email that provided a revised list of engines. She also stated in the email that, "[i]f there [was] any export problem, [they would] have to give up."

McCauley reported this exchange to the Department of Homeland Security. At the direction of the Department, McCauley emailed Man on September 13, 2012. He told her he had located a seller who would allow Man's "customer [to] pick up the engines outside the United States." Man replied that she was "glad to hear from [McCauley]" and would speak with her customer. The next day, Man confirmed to McCauley that her "customer . . . still need[ed] th[e] engine[s]," and she asked if "it [was] possible to [ship the engines to] Hong Kong."

Man later gave McCauley more information about the nature and purpose of her inquiries. She informed him that the Chinese government would provide the money for the sale, that her customer had "made similar transaction[s] with Russia," and that she would receive a "commission" when the deal closed. But she refused to give McCauley additional details because "the procedure [was] very complicated and risky." And when Man asked McCauley for additional information about the seller—including whether "he [was] Chinese"—she stressed that McCauley "need[ed] to make [sure that] the seller is not from [the Federal Bureau of Investigation] because . . . sometimes the [Bureau] officer[s] disguise[] [themselves as] seller[s] to find spy activities."

The "seller," Jerry Liu, was an undercover agent with the Department of Homeland Security. McCauley provided Man with Liu's phone number on September 20, 2012, and Man called Liu "within a few hours." After Liu

4

confirmed to Man that he was "Chinese," Man explained that she was looking for military engines.

Man and Liu discussed legal obstacles to the export of the engines. Liu informed Man that he "[u]sually . . . need[ed] a license to send [the engines] outside" of the country and that a license for export to China "might be a little difficult." He also told her that she should "try to get a license first," but that "[i]f [that] doesn't work, then [they could] talk." Man quickly responded that she would "not get this license." She explained that the "[United States] prohibits sending [these kinds of engines] to China" and that this barrier was why her "friends in mainland China" "need[ed] [her] to do it." Liu then proposed sending the engines "to a third country[,] and then from [there], selling abroad to China." Man agreed to this plan after underscoring that "[n]o mistake[s] [were] allowed."

Man provided Liu with the name of her customer, Xingsheng Zhang, and Zhang's phone number and email address. She explained to Liu that she "was introduced [to Zhang] through another friend who smuggles arms to China." Man also reiterated that her clients were "scared of any mistake," and Liu confirmed that "[they] would be in trouble" "[i]f [they] found the wrong person." And she reminded Liu that they had "to be very careful" because "any mistakes" would be "[v]ery troublesome."

5

Man's fears of legal trouble reemerged in later conversations between her and Liu. For example, she told Liu that, "if there were no embargo . . ., [her clients] would not need . . . [their] help." She also explained that she and McCauley "stopped" their earlier dealings because she "really [didn't] want to touch anything that is in violation of the law" and "[didn't] have any solution" for "get[ting] [the engines] out of the [United States]." Despite these concerns, Man and Liu continued to discuss the price of the engines, how to ship through a third-party country, and Man's "commission" for the sale.

Liu then sent an email in English to Zhang, Man's customer. He did not copy Man on the email, so he called her to ask whether Zhang could understand English. Man informed Liu that Zhang had received the email but that "[h]is English [was] not good." Man also told Liu that Zhang had additional technical questions about the engines, and Liu promised to call Zhang shortly. Man suggested that Liu should try to call in the morning because of Zhang's schedule. And she again expressed concern about how to "hide" the engines and "get them out" of the country. In the light of these difficulties, she told Liu that Zhang might be satisfied with the "technical materials" instead of the engines.

After Zhang confirmed that he was interested in the technical "drawings and information" for the engines, Man and Liu discussed financial terms, Man's "profit," and how to ship through a third-party country. In one conversation, Man

6

suggested that she thought that "shipping to a third country instead of shipping directly to China" was "legal." But Liu replied that he had done "research" and found that "ship[ment] . . . to China is totally illegal" and that "ship[ping] this stuff to China is a violation of the law." He also explained that his "agent" would "require some payment in order to protect himself" because he would be "taking [a] risk." Man again suggested that a third-party shipment would be "legal." But she then rejected Liu's suggestion that she handle the transaction through her corporate bank account because "[a] deposit of a large sum is troublesome." She also instructed Liu not to tell his supplier that the engines are "going to China" and that "the information that this stuff is shipping to China should stop with [him]" "[b]ecause there are many federal agents investigating." And she agreed with Liu that they were "tak[ing] on the highest risk" because they "live[d] in the [United States]." Finally, she directed Liu to not "get [her] involved" "[i]f [he] g[o]t caught."

Man also provided Liu with additional detailed information about Zhang. Man explained that Zhang was "working for the Chinese military[,] sort of like a tech spy," and that he was "trying to find [advanced technology] to provide shortcuts for our country." She also told Liu that Zhang worked for the "China National Aviation Corporation" and that she was hoping to expand her legitimate electronics business into China through Zhang.

7

Later communications between Liu and the individual conspirators followed the same pattern. Liu and Zhang would discuss the engines, technical data, pricing, and shipment details, and Liu then would call Man to update her and to discuss prices, her compensation, and the legal risks of their plan. Liu also emailed Man a "business plan" that specified that the engine "distributor will not know the final destination of the engines" and that "the buyer will not know the identity of the . . . distributor." Liu and Man later discussed this "business plan" and the technical details of the engines over the phone.

Man and Zhang also expressed strong interest in military hardware other than the engines. At one point, Man informed Liu that Zhang "need[ed] material information [about a] drone aircraft." Liu then spoke with Zhang, who confirmed that he wanted "the most advanced" "drone aircraft." After Liu again spoke to Man,  he informed Zhang that he could procure a MQ-9 Reaper drone, but that shipment to China was "totally prohibited" and "a crime in the [United States]." Zhang responded that he would "think about other means" to get the drone.

Liu reported this conversation to Man and asked her to assist in translating technical information. He also confirmed Man's belief that that the drone was "prohibited for export to China." Despite this obstacle, Man confirmed that her buyer was interested in obtaining both the actual drone and its "software" and "mathematical model." Man explained that the software was necessary to "modify"

8

the drone because, if China produced an "identical" drone, "people would know right away that [they] stole it, which is not allowed."

Liu next emailed Zhang a "false flight schematic" for the drone, and Zhang demanded additional data. Liu also sent the fake schematic to Man. He later called her to review the schematic and told her that, "by [his] sending out this page," "all of [them] [had] . . . committed a crime."

Man and Liu also discussed purchasing a military decoy aircraft manufactured in Sweden. In a phone call, Man explained that Zhang was interested in "buying or getting a quote for something like [the decoy]," and she sent a follow-up email with the specific items sought by Zhang. Man and Liu again spoke over the phone, and Liu stated that he would "try to contact people [he] kn[e]w in Europe to see if they [had] any contact with th[e] [manufacturer]." Man also suggested that Liu "could try calling" Zhang about the decoy, and she recommended that Liu do so "in the morning [because Zhang] . . . is a night owl." Man and Liu also discussed having Man's "company sponsor [Zhang] so he could come [to the United States]."

The sale never occurred. Zhang expressed concerns about how quickly Liu could procure the goods, about whether Liu could provide full information about the drone, and about the price of the drone. Liu and Man discussed these obstacles and payment terms, and Man suggested that she would attempt to persuade Zhang

9

to close the deal. She also discussed using "her company to sponsor either . . . Zhang or [an] engineer[] to come over on [a] visa [and] examine th[e] documents," even though she thought that viewing the documents was "illegal." And she told Liu that Zhang "was hesitant to talk much over the phone [because] phone calls in the [United States] are under surveillance." She also expressed her own concerns about the deal and explained that she had "lost so much money." Finally, on June 20, 2013, Zhang told Liu that, although he was "eager[]" to make the deal, he was unconvinced that Liu could "deliver" and that the sale was off. Liu arranged to meet Man in person on September 1, 2015, and federal agents arrested Man at the meeting.

## B.     Procedural History

The United States charged Man and Zhang with conspiracy to export defense articles without a license, but it was unable to apprehend and prosecute Zhang. The parties stipulated that the Arms Control Export Act, 22 U.S.C § 2778, applied to the aircraft engines and the drone at the time of Man's actions, that a "license . . . was required to export any of these items," and that neither Man nor Zhang, "[n]or any company or entity associated with [them,] had a license." And Man did not assert that she planned to obtain a license.

At trial, the government presented testimony from Liu, who explained his communications with the conspirators. He also testified that the United States has

10

maintained an arms embargo against China for decades, *see* 22 C.F.R. § 126.1(a) & (d)(1), and that China uses nationals "living in the [United States] who have access to [military] goods . . . to procure" these items.

The government also introduced several emails and transcripts of phone conversations between Man, Zhang, Liu, and an unnamed, unindicted third party. Man objected to three pieces of evidence, but the district court overruled her objections.

First, Man objected that the transcript of a phone call between Liu and Zhang was hearsay and that Zhang's statements were not admissible under the exception for the statements of fellow conspirators. *See* Fed. R. Evid. 801(d)(2)(E). This conversation included discussion of the engines, shipment through a third-party country, and Man's earlier conversations with Zhang. The district court overruled Man's objection after it explained that Zhang's statements to Liu in the conversation were "made to further the objectives of the conspiracy."

Second, Man argued that three emails sent to Man from an email account with the name "hrkj2006" were inadmissible hearsay because the government failed to identify the owner of the email address. The first email from the mystery address asked Man for an update on "the project." It also was part of a larger email thread that included an email from Man with the subject line "Forward: Mr. Zhang's Order" and an email from Man that discussed the plan to "obtain the

technical information." The second email sent from the unknown account to Man asked her to "check if [she was] able to find the [engines]." And the third email from the unknown account made a slight modification to the earlier list of engines. The district court overruled Man's objections and found that the owner of the "hrkj2006" address was an unindicted conspirator after the government established that the initial email Man sent to Liu with Zhang's "contact information" also copied the "hrkj2006" account.

Third, Man objected that communications between her and Liu about a decoy aircraft produced by a Swedish manufacturer were irrelevant and inadmissible under Federal Rule of Evidence 404(b) because the government had not charged her for the attempt to obtain the Swedish decoy. The district court overruled her objection and explained that this evidence "show[ed] the ongoing relationship" between the conspirators and "reflect[ed] the participation of [Man]." Shortly after it admitted this evidence, the district court instructed the jury that "[n]either . . . Man nor . . . Zhang [were] accused of conspiring to export [the decoy]" and that the jury "should not speculate whether such an act would have been legal or illegal."

On the third day of trial, the government informed the district court that Man had sent text messages in Chinese to Liu during the trial. The messages were largely nonsensical, but they made references to "China" and "sanction[s]." The

12

district court ruled that Man had violated the terms of her pretrial release and remanded her into custody.

Man did not testify. Her attorney argued that insufficient evidence established that Man joined a sufficiently definite conspiracy willfully to violate the Act. Counsel also contended that Man was entrapped by the government, and the district court gave an entrapment instruction. In support of this theory, Man called Kenneth Wallace, an acquaintance of Man who worked for the company that manufactures the MQ-9 drone. Wallace testified that Man never approached him about the drone. But the jury rejected Man's arguments and convicted her.

At sentencing, Man requested both a downward adjustment and downward departure. First, Man asserted that she was a "minimal participant," United States Sentencing Guidelines Manual § 3B1.2(a) (Nov. 2015), because she "was a pawn in [a larger] scheme" to steal American technology. The district court rejected this argument after finding that "Man was much more than a referral source" and was "essential and vital" to the scheme. Second, she asserted that she suffered from "significantly reduced mental capacity" at the time of the offense. *Id.* § 5K2.13. Man pointed to a psychiatric report that found she had a mental illness and underscored that her decision to text Liu during the trial was "very bizarre behavior." The district court rejected this argument after it found that "Man asked

13

specific questions, made repeated requests for assurances, [and] had clear follow-up[s]" during "[t]he period of time that [she] was involved in the [conspiracy]."

Man also objected to a line in the sentencing memorandum submitted by the government that stated, "[Man] should have thought about her family before she put money and nationalism before them." She contended that the reference to "nationalism" erroneously suggested that the district court should impose a sentence based on Man's national origin. *Contra id.* § 5H1.10. The district court "reject[ed Man's contention] that . . . [her] national origin ha[d] been made an issue" and explained that "[h]er actions [were] the relevant factor." It also mentioned both that Man acted out of a "commitment to help the Republic of China" and that she was "faithful to [her] native country," but Man failed to object to these comments. The district court then sentenced Man to 50 months of imprisonment.

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal. "We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government" and making "[a]ll reasonable inferences and credibility choices . . . in favor of the government and the jury's verdict." *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005). We also review *de novo* whether the evidence entitled a jury to reject a defense of entrapment. *See United States v. Isnadin*, 742 F.3d

14

1278, 1303 (11th Cir. 2014). "We review evidentiary rulings for abuse of discretion." *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009). With regard to a sentence, we review *de novo* both "the district court's legal interpretation of the [S]entencing [G]uidelines" and "the district court's application of the [S]entencing [G]uidelines to the facts." *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). But we review for clear error the "denial of a role reduction" because this is a factual finding. *United States v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016). Although we ordinarily review the substantive reasonableness of a sentence for abuse of discretion, *see Cubero*, 754 F.3d at 892, we review only for plain error when the defendant fails to make a timely objection, *see United States v. Rodriguez*, 627 F.3d 1372, 1380 (11th Cir. 2010). The same standard applies when a defendant fails to raise a timely objection under *Brady*. *See United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002).

### III. DISCUSSION

We divide our discussion in four parts. First, we explain that sufficient evidence establishes that Man conspired with Zhang willfully to violate the Act and that the evidence entitled the jury to reject Man's defense of entrapment. Second, we explain that the district court did not abuse its discretion when it admitted evidence of the conspirators' communications. Third, we explain that Man's sentence is procedurally and substantively reasonable. Fourth, we explain

15

that no plain error occurred when the government failed to disclose an email referenced in a conversation between Man and Liu.

### A. Sufficient Evidence Supports Man's Conviction.

The Act empowers "the President . . . to control the import and the export of defense articles," "to designate . . . items which shall be considered as defense articles," and "to promulgate regulations for the . . . export of such articles." 22 U.S.C. § 2778(a)(1). When the President has determined that an item is a "defense article[]," a private individual ordinarily may not export it from the United States without a license or written approval from the government. *Id.* § 2778(b)(2); *see also* 22 C.F.R. §§ 121.1, 123.1, 127.1. As the parties stipulated, the list of designated "defense articles" included the engines, drones, and technical data charged in the indictment at the time of Man's conduct. *See generally* 22 C.F.R. § 121.1. And the Act imposes criminal penalties on "[a]ny person who willfully violates" its prohibitions. 22 U.S.C. § 2778(c).

To establish a conspiracy, the government must prove "(1) [an] agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." *United States v. Broughton*, 689 F.3d 1260, 1277 (11th Cir. 2012). "[T]here can be no . . . conspiracy with a government informer who secretly intends to frustrate the conspiracy," but a "government informer[]

16

may serve as the connecting link between []conspirators." *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965). "Proof is not required that the defendant had knowledge of all the details of the conspiracy; the defendant need only have knowledge of the essential objective of the conspiracy." *United States v. Elledge*, 723 F.2d 864, 866 (11th Cir. 1984) (citation and internal quotation marks omitted). And the government may rely on "circumstantial evidence, such as inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Id.* at 865 (citation and internal quotation marks omitted). But "[w]here the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict," *United States v. Klopf*, 423 F.3d 1228, 1236 (11th Cir. 2005) (citation and internal quotation marks omitted), although "[i]t is not necessary for the government to disprove every reasonable hypothesis of innocence," *United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990) (citation and internal quotation marks omitted).

Man makes three arguments that the government failed to prove that she conspired to violate the Act. First, she argues that she never "enter[ed] into a[] conspiratorial agreement" with "Zhang or anyone else to obtain, purchase[,] or export defense articles." Second, she asserts that she did not conspire to "*willfully* violate[] the [Act]." Third, she contends that the evidence establishes that she was entrapped. None of these arguments is persuasive.

17

1.    Sufficient Evidence Establishes an Agreement Between Man and Zhang.

"A complete[,] detailed agreement is not necessary to convict persons of conspiracy." *Elledge*, 723 F.2d at 868. On the contrary, "a plan may be pretty half-baked and still be a criminal conspiracy if the intentions of the participants are illicit." *United States v. Jones*, 765 F.2d 996, 1002 (11th Cir. 1985). For example, in *Elledge* we upheld a conviction for a conspiracy to smuggle drugs into the United States by airplane despite evidence that the conspirators had not yet agreed on "the precise arrangements for the importation." 723 F.2d at 868. We acknowledged that important elements of the plan, such as "a source for the marijuana, security for the operation, a place to land or drop off the marijuana, a distribution system[,] and financial backers," were "at best uncertain." *Id.* Indeed, the "sponsors backed out" and the defendant "never made final arrangements with the pilot to have the drugs imported." *Id.* Despite these considerable difficulties, we determined that the defendant had reached a sufficiently "detailed agreement" with his conspirators. *Id.*; *accord id.* at 869. We explained that he had, among other things, "contacted financial backers," "me[t] with the pilot," and "had begun to discuss the details of the scheme." *Id.* at 869. And we underscored that the question whether a "plan [is] . . . ultimately completed or executed" is irrelevant to whether the defendants have reached an unlawful agreement. *Id.* Indeed, even "sheer impossibility is no defense." *Jones*, 765 F.2d at 1002.

18

To be sure, if alleged conspirators discuss only a "specially tailored proposal[]" that is *wholly* contingent on the participation of a third party, the negotiations do not ripen into a conspiracy until the necessary third party joins the conspiracy. *Id.* at 1003; *see also id.* at 1001. For example, in *Jones* we held that conversations between the defendant and prospective accomplices about how to import marijuana into the United States by helicopter did not produce an "agreement" when the plan was fully dependent on the participation of an undercover government agent who never agreed to the plan. *Id.* at 1002–03. Although the putative conspirators reached an "understanding" that they would take further steps such as "acquir[ing] the necessary helicopters" and "mov[ing] the contraband cargo," the record established that the plan would go forward only if the government agent "acquiesced, . . . contributed the necessary funds, and satisfied them . . . that he was truly convinced and committed." *Id.* at 1002. And the agent failed to do so. Indeed, no evidence suggested that the alleged conspirators "agreed to submit to anyone proposals other than the ones they submitted to [the agent]" or "ever even exchanged two words after [the agent rejected the proposals]." *Id.* at 1003. In the absence of evidence that the would-be conspirators had formed a "complete plan looking for no more than a [final participant]," *id.* at 1002, or "would have maintained any kind of partnership or joint venture except the one [that they] propos[ed] to [the agent]," we held that "the

19

verdict [could] not stand," *id.* at 1003. But we cautioned that our holding was limited to "very fact-specific" circumstances, *id.* at 1001, where a defendant only "partial[ly] accept[s] [a] proposal[]" that "stat[es] a precondition not met," *id.* at 1003.

Man contends that, "[b]ecause all of . . . Liu's proposals were rejected by Zhang, the parties never advanced beyond mere discussions" or "ever finalized" an agreement. She argues that the evidence "[a]t best [shows that she] and Zhang agreed to submit inquiries about products" and "negotiate an agreement," neither of "which is . . . an agreement for purposes of conspiracy." And she asserts that an "attempt to arrange a purchase" is not "an agreement to carry out an illegal act." We disagree.

Sufficient evidence establishes that Man and Zhang agreed to export unlawfully the items charged in the indictment and that this agreement was not wholly conditioned on Liu's participation. To be sure, Zhang never reached a final, definite agreement with Liu. But the record supports the reasonable inference that Man and Zhang reached an *independent* agreement to acquire the engines and drones from *any* available source and that the duo "would have maintained [a] partnership or joint venture" in addition to "the one [that they] propos[ed] to [Liu]." *Id.* at 1003. Indeed, the search for a supplier began before Man and Zhang became aware of Liu. After Man received an email from the "hrkj2006" account

20

that instructed her to locate military engines, she aimed her initial inquiries at McCauley. And when McCauley recommended Liu, Man readily redirected her efforts.

The conspirators' statements when the deal fell apart also evidence that Man and Zhang intended to find an alternative participant for their scheme. Zhang told Liu that he remained "very eager[] . . . to do [the deal]" and did not "have any financial issues." He explained that he did not intend to make a purchase from Liu because he was "concerned that [Liu] could not deliver in the condition [he] want[ed]." Indeed, Zhang suggested in the same conversation that he might be willing to negotiate new terms if Liu would meet him in Taiwan or Hong Kong. This persistence was sufficient to allow a reasonable jury to infer that Man and Zhang's agreement to obtain the drones and engines was not wholly dependent on Liu and that the conspirators had "agreed to submit to [different potential sellers] proposals other than the ones they submitted to [Liu]." *Id.* In short, the evidence of extensive negotiations and plotting establishes far more than a "half-baked" plan, and that Man and Zhang's attempt to acquire the contraband from Liu ultimately proved "impossib[le] is no defense." *Id.* at 1002.

Evidence of an ongoing and close relationship between Man and Zhang during their search for a supplier also supports the inference that they reached an independent and sufficiently definite agreement to export the relevant items

21

unlawfully. Man brokered the connection between Liu and Zhang and provided Liu with Zhang's email address and phone number. And in her discussions with Liu, Man frequently relayed inquiries and demands from Zhang, such as his interest in the drone and specific engine models. She also provided Liu with detailed information about Zhang, such as that he worked for the Chinese military, was a "tech[nology] spy," and was "a night owl." And she told Liu about Zhang's concern that "the phone calls in the [United States were] under surveillance." A reasonable jury could find that Liu was not a necessary part of Man and Zhang's relationship and agreement.

2.     Sufficient Evidence Establishes that Man and Zhang Conspired Willfully To Violate the Act.

The Act punishes only "willful[]" violations, 22 U.S.C. § 2778(c), and this element of mens rea also applies to a conspiracy to violate the Act, *see United States v. Davis*, 583 F.2d 190, 192 (5th Cir. 1978) ("To sustain a conviction on a charge of conspiracy to commit an offense against the United States[,] the government must prove at least the degree of criminal intent necessary for the substantive offense . . . ."). To establish a "willful[]" violation of the Act, the government must prove that a conspirator actually "knew that it was unlawful to export the [items]" and "intentionally violated [the] known legal duty not to export [them]." *United States v. Adames*, 878 F.2d 1374, 1377 (11th Cir. 1989); *see also Davis*, 583 F.2d at 193. Evidence that a defendant merely "was aware of the

22

generally unlawful nature of her actions" is insufficient. *Adames*, 878 F.2d at 1377; *cf. Etheridge v. United States*, 380 F.2d 804, 807 (5th Cir. 1967) (explaining that the government satisfied its burden to prove that the defendants actually "knew it was unlawful to export [the contraband] from the United States"); *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir. 1979) ("[T]he government must prove that the defendants agreed to and specifically intended to export without a license [a restricted item]."). This heightened element of mens rea applies "[b]ecause the items covered by the [Act] are spelled out in administrative regulations and include items not known generally to be controlled by the government." *Adames*, 878 F.2d at 1377 (quoting *Davis*, 583 F.2d at 193).

The government contends that the Supreme Court has abrogated our precedents in *Davis* and *Adames* and that it needed to prove only that Man was aware that her actions were "generally unlawful." In *Bryan v. United States*, the Supreme Court held that a law that punishes individuals who "willfully engag[e] in the business of dealing in firearms [without a license]" does not require the government to prove that the defendant "was aware of the federal law." 524 U.S. 184, 189 (1998); *accord id.* at 195–96. The Supreme Court explained that the statute requires that the government establish only that the defendant "acted with knowledge that his conduct was unlawful." *Id.* at 192 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). And we later held in *United States v. Starks* that

23

the term "willfully" in the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), requires the government to prove only that a defendant knew that his conduct was generally unlawful, and not that he specifically knew that his actions violated the statute. 157 F.3d 833, 837–39 (11th Cir. 1998). We disagree with the government.

*Bryan* did not abrogate our holding in *Adames* that "aware[ness] of the generally unlawful nature of [one's] actions" is insufficient under the Act and that the government must instead prove a violation of "a known legal duty." 878 F.2d at 1377. *Bryan* and *Starks* addressed circumstances where the defendant was not accused of violating little-known, complex "administrative regulations" like the Act. *Id.* For example, in *Bryan* the Supreme Court explained that its decision about a law that requires firearms dealers to have a license posed little "danger of convicting individuals engaged in apparently innocent activity." 524 U.S. at 195. Indeed, it distinguished *Ratzlaf*, 510 U.S. at 149, where it had held that a conviction for unlawful structuring of bank deposits requires "the jury . . . to find [that the defendant] knew the structuring in which he engaged was unlawful," *id.*, on the ground that "*Ratzlaf* involved [a] *highly technical statute*[] that presented the danger of ensnaring" the unwary, *Bryan*, 524 U.S. at 194 (emphasis added) (footnote omitted). And we explained in *Starks* that the "Anti-Kickback statute . . . is not a *highly technical* . . . regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct" and that "kickbacks are . . . malum in se,

24

rather than malum prohibitum." 157 F.3d at 838 (emphasis added) (italics omitted).

In contrast, we reasoned in *Adames* that "the items covered by the [Act] are spelled

out in administrative regulations and include items not known generally to be

controlled by the government." 878 F.2d at 1377 (quoting *Davis*, 583 F.2d at 193).

Indeed, our analysis was virtually identical to how the Supreme Court in *Bryan*

distinguished the "highly technical statues," 524 U.S. at 194, at issue in *Ratzalf*.

Because *Bryan* did not "overrid[e]" *Adames*, we are bound by our precedent about

the mens rea required by the Act. *United States v. Hanna*, 153 F.3d 1286, 1288

(11th Cir. 1998) ("In this circuit, only the court of appeals sitting en banc, an

overriding United States Supreme Court decision, or a change in the statutory law

can overrule a previous panel decision." (italics omitted)).

Man contends that the government failed to prove that she conspired

willfully to violate the Act based on this heightened element of mens rea. She

asserts that "no evidence [establishes] that the licensing requirements for defense

articles are widely publicized [or were otherwise known to her]." And she contends

that, even if the evidence establishes that she knew that direct shipment to China

was illegal, the evidence fails to establish that she knew that shipment through a

third-party country was similarly prohibited. We disagree.

Ample evidence establishes that Man was not merely "aware of the

generally unlawful nature of her actions," but that she instead conspired to violate

25

the "known legal duty not to export the [defense articles]" without a license. *Adames*, 878 F.2d at 1377. For example, she instructed McCauley to ensure that "the seller is not from [the Federal Bureau of Investigation]." She later told Liu that the "[United States] prohibits sending . . . these types [of engines]" to China, and she rejected outright his suggestion of "get[ting] [a] license." Indeed, Man stated that this obstacle was why the buyer "needed [Man and Liu] to . . . do it." And she later referenced the "embargo" on the shipment of goods to China. Man also told Liu that Zhang was "a tech spy," expressed concern about detection by the "many federal agents [who are] investigating and arresting many Chinese people," and directed Liu not to "get [her] involved" "[i]f [he] g[o]t caught." And she explained to Liu that China intended to "modify" the drone to disguise that it was "stole[n]." These statements entitled the jury to find that Man conspired to violate the Act willfully.

Nor can Man assert that she mistakenly thought that shipment through a third-party country was legal even if she knew that direct shipment to China was not. To be sure, she suggested to McCauley that she would "give up" if there were an "export problem." And she later told Liu that export through a "third party" "is all legal and has no problems." Despite these statements, other evidence establishes that Man knew that federal law squarely prohibited the scheme. Liu told Man that "ship[ment] . . . to China is totally illegal." He also reiterated this warning *after*

26

Man proposed the third-party option, and Man agreed with Liu that "[i]t [was] because of the profit that [they were taking] the risk." And Man continued to fret about criminal exposure even after the conspirators decided to ship via a third-party country. For example, she rejected a proposal to deposit money into her bank account because "[a] deposit of a large sum is troublesome," she acknowledged that she and Liu were "tak[ing] on the highest risk," and she reiterated Zhang's concern that "the phone calls in the [United States] are under surveillance." Liu's warnings, Man's persistent and calculated attempts to evade detection, and Man's statements about the "embargo" and "license" more than entitled the jury to infer that Man conspired willfully to violate the "known legal duty" established by the Act. *Adames*, 878 F.2d at 1377.

### 3.    The Government Did Not Entrap Man.

Man also contends that she was entrapped as a matter of law. "The entrapment defense involves two separate elements: (1) [g]overnment inducement of the crime . . . and (2) lack of predisposition on the part of the defendant." *Isnadin*, 742 F.3d at 1297 (emphasis omitted). On the first element, the defendant must satisfy an "initial burden of production" and show "that the [g]overment's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *Id.* (emphasis omitted) (citation and internal quotation marks omitted). After she does so, "the burden shifts to the [g]overnment

27

to prove beyond a reasonable doubt that [she] was predisposed to commit the crime." *Id.* Predisposition is a question for the jury and "is necessarily a fact-intensive, subjective inquiry into a defendant's state of mind" that considers many kinds of evidence about the defendant's conduct. *Id.* at 1298. For example, the government can point to evidence that the defendant "read[ily] commi[tted] . . . the charged crime" or "was given opportunities to back out of [the] transaction[] but failed to do so." *Id.* (citation and internal quotation marks omitted).

The district court instructed the jury on entrapment, and the parties contest only the second element of whether the government offered sufficient evidence that Man was predisposed to commit the crime. Man maintains that she had no criminal inclinations and joined the scheme only because of "the [g]overnment's insistence." She underscores the length of time between her communications with McCauley and Liu and that the government did not offer evidence of other, "similar conduct on [her] part" outside the conspiracy. This argument fails.

Sufficient evidence entitled the jury to find that Man was predisposed to commit the crime. Man initiated discussions about aircraft engines with McCauley *before* Liu and the government even entered the picture. Liu also repeatedly warned Man that her proposals were illegal, but she persisted despite this prompting to "back out of [the] transaction[]." *Id.* Indeed, Man frequently responded to legal obstacles by devising ways to avoid detection, such as by

28

shipping the engines through a third-party country and by rejecting the deposit of money to her bank account. And her frequent references to how the plan would benefit her financial and business interests evidence an eagerness to commit the crime.

To be sure, nothing suggests that Man engaged in similar conduct during the 18 months between when she asked McCauley about the engines and when McCauley put her in touch with Liu, or during the 27 months between Zhang's rejection of Liu's proposal and Man's arrest. And Wallace testified that Man never approached him about the MQ-9 Reaper drone that his company produces. But that Man did not make incessant attempts to procure military items scarcely establishes that she lacked independent inclination toward the crime. To the contrary, her sporadic, targeted inquiries are fully consistent with the delicate and furtive nature of espionage.

B.    *The District Court Did Not Abuse Its Discretion when It Admitted Evidence of the Conspirators' Communications.*

Man complains about three evidentiary rulings. First, she objects on the basis of hearsay to the admission of a transcript of a conversation between Liu and Zhang. Second, she objects on the same ground to the admission of three emails sent to her by an unidentified, unindicted third party. Third, she objects to the admission of communications between her and Liu about their efforts to obtain technology from Sweden on the basis that this uncharged conduct was inadmissible

29

character evidence and unduly prejudicial. We consider and reject these arguments in turn.

> 1.    The Transcript of a Conversation Between Liu and Zhang

Federal Rule of Evidence 802 ordinarily prohibits the admission of hearsay statements, but Rule 801(d)(2)(E) creates an exception when a "statement is offered against [a defendant]" and "was made by the [defendant's] coconspirator during and in furtherance of the conspiracy." To avail itself of this exception, "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant . . ., and (3) the statement was made during the course of and in furtherance of the conspiracy." *United States v. Underwood*, 446 F.3d 1340, 1345–46 (11th Cir. 2006).

We "appl[y] a liberal standard in determining whether a statement was in furtherance of a conspiracy." *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011). Indeed, "[t]he statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." *Id.* (citation and internal quotation marks omitted). For example, statements that "could have been intended to affect future dealings between the parties," that "provide reassurance," that "serve to maintain trust and cohesiveness," or that "inform [other conspirators] of the current status of the conspiracy" satisfy this standard. *Id.* (citations and internal quotation marks omitted).

30

Whether a statement was made in furtherance of a conspiracy is a factual issue decided by the district court. *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). The district court "may consider any evidence," including "the alleged hearsay statement and independent outside evidence," and it "is bound only by the privilege rules." *United States v. Byrom*, 910 F.2d 725, 734–35 (11th Cir. 1990). And it "has discretion to admit the statements [preemptively] subject to [later] proof of the[] three requirements during the course of the trial." *United States v. Fernandez*, 797 F.2d 943, 945 (11th Cir. 1986).

Man contends that a transcript of a conversation between Liu and Zhang where the men discussed the engines, shipment through a third-party country, and Zhang's earlier communications with Man was inadmissible for two reasons. First, she contends that the government failed to prove that she and Zhang were conspirators. Second, she argues that insufficient "independent evidence at the time of the exhibit's introduction [established] that Zhang and Man were members of the same conspiracy," especially in the light of her "misunderst[anding] [about] the legality of [the scheme]."

The district court was entitled to admit the transcript. As explained above, sufficient evidence suggests a conspiracy between Zhang and Man to violate the Act. And the conversation between Zhang and Liu was made during the course of and in furtherance of this conspiracy. At the beginning of the conversation, Liu

31

explained to Zhang that he was working "with . . . Man [on] the engines." Liu then informed Zhang what engines he could obtain, told Zhang that "it is not good to export directly to China" because "the [United States] would not allow [a sale] to China," and suggested third-party intermediaries. Both Liu and Zhang repeatedly referred to Man by name during the conversation and suggested that future communications would go through her. And they discussed the prospect of obtaining other military goods in addition to the engines. This evidence establishes that the conversation occurred during the course of and in furtherance of a conspiracy between Man and Zhang. And contrary to Man's suggestion that the district court prematurely admitted this evidence, a district court has discretion to "admit [another conspirator's] statements subject to [later] proof . . . during the course of the trial." *Id.* The totality of the evidence introduced at trial satisfied the requirements of the conspirator exception.

2.　The Emails that an Unidentified Third Party Sent to Man

As explained above, statements of another conspirator are not hearsay if the government proves "that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant . . ., and (3) the statement was made during the course of and in furtherance of the conspiracy." *Underwood*, 446 F.3d at 1346. "Statements made by an unindicted coconspirator are admissible so long as the government makes the proper showing." *United States v. Montes-Cardenas*, 746

32

F.2d 771, 779 (11th Cir. 1984). Indeed, "a defendant may be convicted of conspiring with persons whose names are unknown . . . if the indictment asserts that such other persons exist . . . and the evidence supports their existence and the existence of a conspiracy." *United States v. Rodriguez*, 765 F.2d 1546, 1552 (11th Cir. 1985) (citation and internal quotation marks omitted).

Man objects to the admission of three emails sent to her by the unidentified owner of the "hrkj2006" email address between March 2011 and December 2012. Although these emails contain repeated references to Liu, Zhang, and the engines, Man contends that they are inadmissible hearsay because the government never proved that Man was part of a conspiracy, that the owner of the unidentified email address was a member of the conspiracy, or that the emails were sent during the course of and in furtherance of the conspiracy. But the district court was entitled to find otherwise.

The record establishes that Man was part of a conspiracy to export restricted military goods unlawfully, that the owner of the unidentified email address was part of the conspiracy, and that the emails were sent during the course of and in furtherance of the conspiracy. For example, when Man initially provided Liu with Zhang's email address and cell phone number via email, she also copied the "hrkj2006" address. The first disputed email sent to Man from the mystery address was part of an email thread that included an email from Man with the subject line

33

"Forward: Mr. Zhang's Order" and listed the model numbers of the engines and aircraft that were the objects of the conspiracy. It also referenced earlier communications between Liu and Zhang, the legal difficulties posed by export to China, and the plan to "obtain the technical information." The second email sent from the unknown address to Man again listed several engines, and, two days later, Man asked McCauley about these engines. And the third disputed email referenced Zhang and directed Man to locate the engines. These emails evidence that Man was part of a conspiracy to violate the Act, that the owner of the address also was part of the conspiracy, and that the emails were sent during the course of and in furtherance of the conspiracy.

3.    Communications Between Man and Liu About the Swedish Decoy Aircraft

Federal Rule of Evidence 404(b) may foreclose the admission of uncharged crimes and other bad acts, but this rule does not apply to evidence that is "intrinsic" to "the charged offenses." *United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015). Evidence is intrinsic if it "arose out of the same transaction or series of transactions as the charged offense," is "necessary to complete the story of the crime," or is "inextricably intertwined with the evidence regarding the charged offense." *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995) (citation and internal quotation marks omitted). The district court may exclude such evidence "if its probative value is substantially outweighed by a danger of . . .

34

unfair prejudice," Fed. R. Evid. 403, but exclusion is "an extraordinary remedy that must be used sparingly," *United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009).

Man contends that the transcript of a conversation and an email where she asked Liu about a Swedish decoy aircraft were inadmissible because this evidence was extrinsic, irrelevant, and prejudicial. She underscores that these communications were not made in furtherance of a conspiracy because her attempt to obtain the decoy aircraft was not charged in the indictment. And she concludes that this evidence was "pure propensity evidence" that violated Rule 404(b) and imposed substantial prejudice in violation of Rule 403. We disagree.

The evidence about Man's inquiries into the Swedish aircraft was intrinsic and admissible. The conversation and phone call "arose out of the same . . . series of transactions as the charged offense" and were "inextricably intertwined with the evidence regarding the charged offense," *Ramsdale*, 61 F.3d at 829 (citation and internal quotation marks omitted), because they were two in a series of communications between Man and Liu about what military goods Liu could provide to the conspirators. Indeed, Man made frequent references to Zhang in the conversation, and Man sent the email as a follow-up to an earlier conversation with Liu that the government had admitted into evidence without objection. This evidence of ongoing discussions between Man and Liu also underscored that Man

35

was the vital link between Liu and Zhang and offered the jury insight into Man and Zhang's relationship. Indeed, Man's statement during the conversation that her company might "sponsor" Zhang for entry to the United States showed that she had a significant role in the scheme.

The prejudicial effect of this evidence also did not "substantially outweigh[]" its probative value. Fed. R. Evid. 403. Evidence of an ongoing and active relationship between Man, Zhang, and Liu was highly probative of Man's active role in a conspiracy to violate the Act. Indeed, Man's persistent communications with Liu rebutted her suggestion that she was an unwilling participant entrapped by the government. The district court also instructed the jury that Man was not "accused of conspiring to export [the Swedish decoy]" and that the jury "should not speculate whether such an act would have been legal or illegal." And "we must presume that [the] jur[y] follow[ed] th[is] instruction[]." *United States v. Zitron*, 810 F.3d 1253, 1258 (11th Cir. 2016) (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002)). In short, the district court did not abuse its discretion when it refused to invoke the "extraordinary remedy" of Rule 403. *U.S. Infrastructure*, 576 F.3d at 1211.

### C. Man's Sentence is Procedurally and Substantively Reasonable.

Man makes two arguments about her sentence. She contends that her sentence is procedurally unreasonable because the district court failed to decrease

36

her offense level for her "minimal participa[tion]" in the conspiracy. *See* U.S.S.G. § 3B1.2(a). And she contends that her sentence is substantively unreasonable because the district court erroneously considered her "national origin." *See* U.S.S.G. § 5H1.10. Neither argument is persuasive.

### 1.    Procedural Reasonableness

The Sentencing Guidelines direct a district court to decrease a defendant's offense level by four levels "[i]f the defendant was a minimal participant in [the] criminal activity." U.S.S.G. § 3B1.2(a). "The defendant bears the burden of establishing [this adjustment] by a preponderance of the evidence." *Cruickshank*, 837 F.3d at 1192. "In determining whether [the] adjustment applies, the district court should consider, first, the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and, second, his role as compared to that of other participants in his relevant conduct." *United States v. Wright*, 862 F.3d 1265, 1277–78 (11th Cir. 2017) (citation and internal quotation marks omitted). The district court must consider "all of the facts probative of [her] role in her relevant conduct," *United States v. Rodriguez De Varon*, 175 F.3d 930, 943 (11th Cir. 1999), and evaluate "the totality of the circumstances and . . . the facts of [each] particular case," U.S.S.G. § 3B1.2 cmt. n.3(C). To assist courts with this task, the Guidelines provide a "non-exhaustive list of factors," such as "the degree to which the defendant understood the scope and structure of the criminal activity,"

37

"the degree to which the defendant participated in planning or organizing the criminal activity," "the degree to which the defendant exercised . . . or influenced the exercise of decision-making authority," the "nature and extent of the defendant's participation," and "the degree to which the defendant stood to benefit." *Id.*

Man contends that she was entitled to a downward adjustment for her minimal role. She underscores that she reported to Zhang, that Zhang had final authority to negotiate a deal with Liu, that Zhang was the "principal target" of the investigation, and that she was just one actor in a larger criminal conspiracy to steal any and all American technology. And she suggests that she could not have played an important role in the conspiracy because her "mental health status was questionable." We disagree.

The district court did not clearly err when it took a "permissible view[]" of the evidence to the contrary. *Rodriguez De Varon*, 175 F.3d at 945 (citation and internal quotation marks omitted). Man's own "relevant conduct," *id.*, establishes that she played "an important or essential role" in the charged conspiracy, *id.* at 943. For example, she put Liu in touch with Zhang, discussed prices and terms with Liu, and even explained that she was a necessary figure because she was "in the [United States]" and Zhang was "physically in China." Similarly, the "nature

38

and extent of [her] participation" was substantial because she was the sole domestic intermediary between Zhang and Liu. U.S.S.G. § 3B1.2 cmt. n.3(C).

The record also establishes that Man played a meaningful role in "planning or organizing" the crime. *Id.* She made the initial connections with McCauley and Liu, put Liu in touch with Zhang, and discussed routing the contraband through a third-party country to evade detection. And she assumed an active role when she suggested that she might sponsor Zhang for entry into the United States.

Man also "understood the scope and structure of the criminal activity." *Id.* She frequently stated that the scheme was illegal and risky and even proposed evading detection by shipping the engines through a third-party country. Her description of Zhang as "a tech spy" who had "made similar transaction[s] with Russia" also underscores her knowledge about the scope of her criminal behavior.

And Man "stood to benefit" from the enterprise. *Id.* For example, she repeatedly discussed her "commission," with Liu, demanded a "profit" of "over . . . 10 percent," and agreed with Liu's statement that "[it] [was] because of the profit that [they were] tak[ing] the risk." She also suggested that her participation in the deal would allow her company to do business in China.

Finally, Man's suggestion that her mental health status entitles her to a minimal-role adjustment under section 3B1.2 is meritless. Mental capacity is covered by a different section of the Guidelines, § 5K2.13, the district court denied

39

Man a downward departure under that section, and Man abandoned her argument for a downward departure when she failed to invoke that section on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("Under our caselaw, a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate." (citation and internal quotation marks omitted)). And even if we could review this abandoned argument, the district court was entitled to reject Man's contention based on its finding that "Man asked specific questions, made repeated requests for assurances, [and] had clear follow-up[s]" during "[t]he period of time that [she] was involved in the [conspiracy]." Indeed, Man's persistent, deliberate, and sophisticated communications with McCauley, Lin, and Zhang over a long period of time and her frequent expressions of concern about detection by law enforcement show a heightened awareness of and control over her conduct. She cannot now disclaim responsibility for her actions.

### 2.    Substantive Reasonableness

"[A] sentence may be substantively unreasonable when the district court . . . bases the sentence on [an] impermissible factor[]," *United States v. Pugh*, 515 F.3d 1179, 1191–92 (11th Cir. 2008), such as a defendant's "[n]ational [o]rigin" or "[r]eligion," U.S.S.G. § 5H1.10. But we have clarified that mere references to a forbidden factor are permissible when the district court imposes the sentence

40

because of the behaviors and motivations prompted by that factor and not by the underlying factor itself. For example, in *United States v. Clay*, we explained that a "district court did not consider [a defendant's] religious belief[s]" when it "credited testimony . . . about *changes in* [*the defendant's*] *life* that followed his religious conversion." 483 F.3d 739, 745 (11th Cir. 2007) (emphasis added). We have also explained that the district court may consider the gravity of behaviors that have an "impact on national security." *United States v. Valnor*, 451 F.3d 744, 751 (11th Cir. 2006).

Man contends for the first time on appeal that the district court erroneously relied on her national origin. She points to its statements at the sentencing hearing that Man acted out of a "commitment to help the Republic of China" and that she was "faithful to [her] native country." And she renews her complaint about the assertion of the government its sentencing memorandum that Man put "nationalism before [her family] in her priorities." We are unpersuaded.

The district court was entitled to reference Man's allegiance to China. To begin, the discussion of Man's *loyalty* has nothing to do with her *identity*, for an American citizen can be loyal to a foreign country for a variety of reasons that have nothing to do with national origin or ethnicity. *See, e.g.*, *United States v. Rosenberg*, 195 F.2d 583, 604 (2d Cir. 1952) (explaining that the defendants contended that, "at the most, *out of idealistic motives*, they gave secret information

41

to Soviet Russia" (emphasis added)). Indeed, the district court "reject[ed Man's argument] that . . . [her] national origin [was] an issue" and explained that her "actions," and not her "national origin," were "the relevant factor." It also underscored that her conduct had significant "potential [to] harm[] . . . national security" and that "[t]he clear intent of th[e] conspiracy was to enable [China]" to steal military technology. This examination of the consequences and motivations of Man's behavior, particularly its implications for "national security," *Valnor*, 451 F.3d at 751, was legitimate, *see Clay*, 483 F.3d at 745.

D.    *No Plain Error Occurred when the Government Failed To Provide Man with an Email Sent by Liu to Zhang.*

Under *Brady*, the government must not "suppress[] . . . evidence favorable to [the] accused." *United States v. Esquenazi*, 752 F.3d 912, 933 (11th Cir. 2014) (quoting *Brady*, 373 U.S. at 87). To establish a violation of this duty to disclose exculpatory evidence, the defendant must prove that "the government possessed favorable evidence," that she did "not possess the evidence and could not [have] obtain[ed] the evidence with any reasonable diligence," that the government "suppressed the favorable evidence," and that the evidence creates a "reasonable probability" of a different outcome. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).

Man contends that the government failed to provide her with an email that Liu sent to Zhang in October 2012. The record does not establish the contents of

42

the email, likely because Man failed to raise the issue to the district court and permit it an opportunity to hold an evidentiary hearing. Indeed, the only reference to the existence of this email is found in a transcript of a phone conversation between Liu and Man that the government introduced at trial. In this conversation, Liu mentions that he "sent out an e-mail" to Man's "friend in China" but "forgot to [copy her]." According to Man, this email is material because it "could have been used to impeach the statements of . . . Liu" at trial.

No plain error occurred. Man knew about the email because Liu mentioned it to her during their conversation, yet she failed to exercise "reasonable diligence" in procuring it before trial. *Id.* Indeed, she even told Liu in the same conversation she had "talked to [Zhang] over the phone" about the email, further underscoring her awareness. She also fails to offer any evidence or articulate any inference to establish a "reasonable probability" that the email would have changed the verdict. *Id.* On the contrary, the email almost certainly would have helped the government establish a conspiracy by reinforcing the connection between Man and Zhang. For example, during his post-email conversation with Man, Liu suggested that he should have copied her on the email. And Man suggested that Zhang had informed her that the email was about the engines. This evidence is entirely consistent with a conspiracy and would have been of little use to Man.

43

## IV. CONCLUSION

We **AFFIRM** Man's judgment of conviction and sentence.