[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13163
Non-Argument Calendar

_____

D.C. Docket No. 2:19-cr-00024-SCJ-JCF-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARIA ISABEL GONZALEZ MALDONADO,
a.k.a. Maria Isabel Gonzalez-Maldonado,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 17, 2021)

Before LAGOA, BRASHER, and ANDERSON, Circuit Judges.

PER CURIAM:

Maria Isabel Gonzalez Maldonado appeals her sentence of 97 months' imprisonment for one count of conspiracy to possess with intent to distribute methamphetamine and one count of possession with intent to distribute fifty grams or more of methamphetamine. She raises two arguments on appeal: (1) the district court miscalculated the total quantity of methamphetamine attributed to her in her role in the conspiracy and (2) the district court should have reduced her base-offense level as a "minor participant." We disagree on both points and affirm her sentence.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

A federal grand jury indicted Maldonado and six co-defendants on twenty total counts relating to a methamphetamine conspiracy. The indictment charged Maldonado only in Count One, conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a), (b)(1)(C), and 846, and Count Twelve, possession with intent to distribute at least 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). Maldonado ultimately pled guilty to both counts and the district court sentenced her to 97 months' imprisonment. The salient facts are as follows.

Throughout 2018 and 2019, a joint investigation between the Georgia Bureau of Investigation and the Federal Bureau of Investigation led to agents intercepting phone calls and text messages between Maldonado and co-defendant Teofilo Carlos Santana Medrano. In the early months of 2019, Santana visited Maldonado's house

2

several times to obtain an unknown amount of methamphetamine to distribute to the other co-defendants, who, in turn, sold it to their buyers. Because Maldonado challenges the district court's calculation of the total amount of the unknown and unseized drugs, we recount the following in detail.

On February 15, 2019, Maldonado messaged Santana: "The man called me. If I give you one when do you think you'd have the paper?" Santana responded that he would have it soon, but that he "might be able to get two bucks together by today." Maldonado replied, saying that she would talk to the man, and later informed Santana that the deal would happen. She asked Santana if she could give this unidentified man Santana's phone number so they could arrange a place to meet. Additional messages later established that Santana had agreed to bring something to Maldonado. Agents believed that Maldonado gave one kilogram of methamphetamine to Santana, who provided a $2,000 "partial" payment in return.

Two days later, on February 17, 2019, Maldonado asked Santana if he wanted a "half" the next day. Santana replied, telling Maldonado that his friend would get the "half" on February 20, 2019. Santana requested Maldonado's bank-account information, and GPS tracking placed Santana at Maldonado's house later that day. Agents believed that Santana visited Maldonado to obtain 0.5 kilogram or more of methamphetamine.

A failed deal for another 0.5 kilogram of methamphetamine happened the next day, but the two closed a deal for another 1.5 kilograms on February 28, 2019. On March 1, Santana contacted Maldonado to see when she would "bring the rest," and agents believed, based on GPS tracking, that Santana went to Maldonado's residence to obtain the remaining amount of the requested methamphetamine from Maldonado. On March 2, 2019, Santana told Maldonado that he would send someone over to her house with "500" and would bring her "the seven" later that afternoon. He asked Maldonado to set aside "one and a half," which the agents believed to be 1.5 kilograms of methamphetamine.

The back and forth came to an end on May 9, 2019, when federal agents executed a search warrant, arrested Maldonado, and seized numerous cell phones. Maldonado pled guilty to both counts against her without a plea agreement from the government. The district court accepted her change of plea.

The presentence investigation report calculated Maldonado's base offense level at a 34. This level was based on her distribution of "at least 5 kilograms" of methamphetamine. Prior to sentencing, Maldonado filed a written objection to this determination, arguing that the evidence was insufficient to determine the quantity of drugs.

At the sentencing hearing, the government presented the testimony of the lead FBI special agent who had been surveilling Maldonado since 2018. The agent

testified that he determined Santana would purchase half or full kilograms of methamphetamine at a time from Maldonado. Santana, in turn, would charge his buyers roughly $400 per ounce of methamphetamine.

The agent also provided testimony on his experience with drug dealers' use of code words to conceal their illegal activities. For instance, he testified that one of Maldonado's messages on February 15—"The man called me. If I give you one, when do you think you would have the paper"—indicated that she was brokering a deal between a third party and Santana for one kilogram of methamphetamine and asking when Santana would have the money for it. Based on his experience dealing with this code language, he was able to identify numerous conversations between Maldonado and Santana regarding the purchase of methamphetamine in the amount of kilograms, not ounces. He determined that Santana obtained methamphetamine from Maldonado on several occasions and that she was his primary source of the drugs.

Based on his experience, and over the course of his investigation, the agent testified in great detail to eight specific transactions between Maldonado and Santana. In addition to the four transactions discussed above—1 kilogram on February 15, 2019; 0.5 kilogram on February 19, 2019; 1.5 kilograms on February 28, 2019; and 1.5 kilograms on March 2, 2019—the agent identified the following four additional transactions between Maldonado and Santana:

- 0.5 kilogram on March 5, 2019;

- 1 kilogram on March 13, 2019;

- 2 kilograms on April 9, 2019; and

- 0.5 kilogram on April 17, 2019.

Ultimately, it was the agent's conclusion that Maldonado provided to Santana "at least" 8.5 kilograms of methamphetamine.

The agent also testified that he conducted a so-called "safety valve" interview with Maldonado. *See* 18 U.S.C. § 3553(f). His impression was that she seemed well versed in the quantities, prices, and techniques involved in distributing methamphetamine. During the interview, Maldonado insisted that the largest amount of methamphetamine she helped distribute was 0.5 kilogram and that she had been involved in "only" two transactions. The agent, however, testified that he found this to be untruthful simply based on the number of times Santana visited her house.

Following the live testimony, Maldonado argued several points. First, she argued that the government provided insufficient evidence to prove the amount of drugs attributable to her was as high as in "the amount of kilograms." She insisted such an estimate was based only on the government's speculation. According to Maldonado, even if Santana were selling "kilograms" of the drugs—not "ounces"— he had multiple sources to obtain the drugs and thus the amount was not all from

her.  In total, she requested the district court calculate the drug quantity between 1.5 and 5 kilograms, not "at least" 5 kilograms.  She also asked the court to consider her a "minor participant" in the drug conspiracy, requesting a two-level reduction under the Sentencing Guidelines.

The district court rejected both arguments.  Specifically, as to the two-level reduction for being a minor participant, the district court noted on the record that it was required to assess Maldonado's conduct against five factors, which are delineated and discussed further below in our analysis.  The district court determined that three factors weighed against Maldonado, one in her favor, and one neither for nor against her.  Accordingly, the district court found that Maldonado did not qualify for such a reduction.

The district court calculated Maldonado's total offense level at a 31, leaving the Sentencing Guidelines' range at 108 to 135 months' imprisonment.  For a reason not entirely clear from the record, the district court varied downward one level to 30 and sentenced Maldonado to 97 months' imprisonment, followed by five years' supervised release for each count.  After preserving the relevant issues for appeal by way of proper objections, Maldonado filed this appeal.

## II.     ANALYSIS

Maldonado raises two issues on appeal.  First, she argues that the district court clearly erred in its calculation of the quantity of drugs.  Second, she argues that the

district court clearly erred by denying her request for a two-level minor-role reduction under the Sentencing Guidelines.  We discuss each argument in turn.

### A.     The Drug-Quantity Calculation

First, Maldonado argues that the district court clearly erred in determining the drug quantity that could be attributed to her.  She insists the district court's calculation of "between 5 and 15 kilograms" is too high.  Rather, under her argued-for calculation, the most that could be attributed to her is between 1.5 and 5 kilograms.

We review a district court's determination of the drug quantity attributable to the defendant for clear error.  *United States v. Azmat*, 805 F.3d 1018, 1046 (11th Cir. 2015).  To find clear error, among other things, we must be left with a "definite and firm conviction that a mistake has been committed."  *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010) (quoting *Rodriguez*-Lopez, 363 F.3d 1134, 1137 (11th Cir. 2004)).

The government bears the burden of establishing the quantity of drugs by a preponderance of the evidence, *Azmat*, 805 F.3d at 1046, and it is required to put forward "reliable and specific evidence" when the defendant objects to the proffered amount, *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012).  When the exact quantity is unknown because the drugs were not seized by authorities, the district court must estimate the quantity.  *See* U.S.S.G. § 2D1.1 cmt. n.5; *see also*

*United States v. Barsoum*, 763 F.3d 1321, 1333 (11th Cir. 2014). The court may rely on evidence demonstrating "the average frequency and amount of a defendant's drug sales over a given period of time." *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996).

We find no clear error in the district court's calculation. In fact, there is strong record evidence that Maldonado was accountable for at least five kilograms of methamphetamine. We find particularly convincing the extensive testimony of the special agent. As a foundation, this testimony established a distribution relationship between Maldonado and Santana. Furthermore, this testimony provided the court with compelling explanation of code words and price-matching. From there, the district court was able to establish that Santana purchased half-kilogram or kilogram quantities from Maldonado on at least eight occasions. A most conservative estimate from our calculation, Maldonado was responsible for *at least* 8.5 kilograms of methamphetamine.

The only colorable point that Maldonado raises is the agent's "admission" that Santana "had other sources of supply for methamphetamine." Although this may be true—and perhaps probative of other parties' cases in this larger conspiracy—it does not sufficiently rebut the actual evidence offered by the agent of the eight transactions totaling 8.5 kilograms directly from Maldonado. In other words, whether Santana possessed, conspired to possess, purchased, or sold additional

9

amounts from other dealers is neither relevant to Maldonado's case nor dispositive as to the quantity of methamphetamine that Maldonado, herself, sold him.

Maldonado's argument on appeal is a valiant assay in trying to cast doubt in the district court's calculation, but it is an unsuccessful plight.  Much of her contention—indeed, virtually all of it—is not only speculative, but simply a different interpretation of the facts.  As a matter of law, this cannot establish clear error. *United States v. Izquierdo*, 448 F.3d 1269, 1278 (11th Cir. 2006) (rejecting the notion that clear error can be established by simply noting that "there are two permissible views of the evidence" (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985))).

### B.    The Minor-Role Reduction

Next, Maldonado argues that the district court clearly erred in rejecting her request to be considered a "minor participant" under § 3B1.2 of the Sentencing Guidelines.  She contends that she was merely "a gatekeeper" for Santana and that he was her only customer.  She argues that she did not participate in the planning or organizing of the criminal activity and, therefore, the district court's finding that she "set up" the drug deals was an "overreach."

We review the district court's determination of a defendant's role in the offense for clear error.  *United States v. Rodriguez de Varon*, 175 F.3d 930, 937 (11th Cir. 1999).  The Sentencing Guidelines provide for a two-level reduction if the

10

defendant was a "minor participant" in the crime. U.S.S.G. § 3B1.2(b). "A 'minor participant' is someone who is 'less culpable than most other participants, but whose role could not be described as minimal.'" *United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015) (quoting U.S.S.G. § 3B1.2 cmt. n.5). The defendant has the burden of proving her mitigating role in the offense by a preponderance of the evidence. *Rodriguez de Varon*, 175 F.3d at 939. And the district court has "considerable discretion in making this fact-intensive determination." *United States v. Boyd*, 291 F.3d 1274, 1277–78 (11th Cir. 2002).

There is a two-pronged inquiry to determine whether a role reduction applies, considering all probative facts involving the defendant's role and evaluating the totality of the circumstances. *United States v. Man*, 891 F.3d 1253, 1274 (11th Cir. 2018). Specifically, the district court is to consider the defendant's role: (1) in the relevant conduct for which she has been held accountable at sentencing; and (2) as compared to that of the other participants in her relevant conduct. *United States v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016). The district court is also to consider the totality of the circumstances of several factors when determining whether a defendant qualifies for a role reduction, including:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;

11

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B.1.2 cmt. n.3(C); *see United States v. Presendieu*, 880 F.3d 1228, 1249–50 (11th Cir. 2018).

Here, the district court properly and sufficiently considered and applied these factors. Again, the district court weighed the first, second, and fourth factors against Maldonado, the third factor in her favor, and did not weigh the fifth factor either for or against her. We find no error in any of these determinations.

The district court weighed the first factor—the degree to which she understood the scope and structure of the criminal activity—against Maldonado. She argues this was error, as she understood the scope and structure of the criminal activity only to "a limited degree." She again cursorily alleges that she was merely a "gatekeeper" with only one customer. That is the extent of her argument. We do not find this persuasive. Among other things, the agent testified that Maldonado was "well versed" in the lexicon of methamphetamine, including the quantities, prices, and techniques involved in distributing and selling it. We can hardly say it was clear error for the district court to conclude that she was more than a "limited" participant.

12

The same can be said of the second factor— the degree to which she participated in planning or organizing the criminal activity. Maldonado admits she was a "broker," or, in her words, "an intermediary between Santana and the unknown person above [her]." Yet she contends it was an "overreach" to find that she "set up" the deals. She insists that she participated in neither the planning nor the organizing of the deals, claiming that the evidence does not show she ever took it on herself to broker any deals at her own direction. Again, we disagree. The seized phone records clearly demonstrate Maldonado planned and organized the distribution of the methamphetamine to Santana.

Finally, the fourth factor was also properly weighed against Maldonado. Contrary to her claims, the agent's testimony showed that Maldonado set the time and location of the deals. We agree with the government: Maldonado was "essential to the successes of the drug-trafficking scheme."

Weighing three of the five factors against Maldonado, we cannot say the district court clearly erred in rejecting her request for this reduction. Further, as we have previously stated, "[w]hen the relevant conduct attributed to a defendant is identical to [her] actual conduct, [she] cannot prove that [she] is entitled to a minor-role adjustment simply by pointing to some broader scheme for which [she] was not held accountable." *See United States v. Alvarez-Coria*, 447 F.3d 1340, 1343 (11th Cir. 2006). Accordingly, because the relevant conduct for which Maldonado was

13

held accountable was identical to her actual conduct, her request for a minor-role reduction fails.

Turning to the other consideration, when considering Maldonado's role as compared to her co-defendants' roles, we agree with the government that she has failed to present evidence that her conduct was less significant than her co-defendants. Based on the agent's credible testimony, Maldonado was Santana's supplier and was much more important to the conspiracy than simply being a "gatekeeper."

## III.    CONCLUSION

Maldonado cannot show clear error in the district court's calculation of the amount of methamphetamine attributed to her or in the district court's determination not to apply a two-level role reduction. Accordingly, we affirm her sentence.

**AFFIRMED**